FILED

May 02 2017, 3:56 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT
Ruth Ann Johnson
Marion County Public Defender

Victoria L. Bailey
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Curtis T. Hill, Jr.
Attorney General of Indiana

Andrew A. Kobe
Deputy Attorney General

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

_____

# In the
# Indiana Supreme Court

_____

No. 71S00-1509-LW-539

MARK LEONARD,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

Appeal from the St. Joseph Superior Court, Division 2, No. 71D02-1408-MR-000009
The Honorable John M. Marnocha, Judge

_____

On Direct Appeal

_____

**May 2, 2017**

**Rucker, Justice.**

**Case Summary**

Among other offenses a jury convicted Mark Leonard of two counts of murder for which the trial court imposed consecutive life without parole sentences. In this direct appeal Leonard raises several issues for our review which we consolidate, rephrase, and reorder as follows: (1) Is the evidence sufficient to support the murder convictions; (2) Did the State prove an alleged aggravator beyond a reasonable doubt; (3) Did the trial court abuse its discretion by admitting Leonard's out of court statements into evidence; and (4) Is Indiana's life without parole statute unconstitutional. We affirm Leonard's convictions and sentences.

**Background**

Richmond Hill is a quiet subdivision on the southeast side of Indianapolis. Shortly after 11:00 p.m. on November 10, 2012, this tranquil enclave was rocked by a massive explosion that could be heard for more than ten miles away. One Richmond Hill resident awakened by the explosion is a combat veteran who served a tour of duty in Afghanistan. The sound caused him to have flashbacks and to question where he was. Other Richmond Hill residents made their way outside to find homes in a "shredded" state, a state of complete "chaos"; and variously described what they saw: "smoke", insulation falling like snow, "debris absolutely everywhere," "total destruction," a "war zone," rubble "up to my knees," people "running" and screaming, people "disoriented" and "dazed," "devastation," "raining ash" and cinder, a "blast zone." See generally Tr. at 803-1710. Firefighters at a station nearby heard and felt the explosion, and even before emergency calls came in, they set out in the direction of "a large plume of . . . debris and smoke[.]" Tr. at 723. Approaching the neighborhood these first responders observed several houses on fire. Nearly thirty homes were damaged severely enough that they had to be demolished. Others suffered extensive but repairable damage.

Parallel investigations into the explosion were conducted by the Indianapolis Fire Department; the Indianapolis Metropolitan Police Department; the Department of Homeland Security; the federal Bureau of Alcohol, Tobacco, Firearms and Explosives; Citizens Energy Group; and various other federal and state governmental agencies and insurance companies.

2

Because of the neighborhood's proximity to a municipal airport, investigators initially questioned whether the explosion could have been caused by an airplane crash. They also considered the possibility that a methamphetamine lab exploded or that this was a weather-related incident. These theories were quickly ruled out, and investigators focused on the possibility of a natural gas explosion.

The home at the epicenter of these events was owned by Monserrate Shirley, a nine-year resident of Richmond Hill. Her boyfriend Mark Leonard also lived at the residence along with Shirley's teenaged daughter and the family cat. No one was home at the time of the explosion. Ultimately authorities concluded natural gas was intentionally leaked into the Shirley home through a modification of the fireplace and that a delayed timing device was triggered which caused an explosion equal in force to approximately three tons of TNT.

**Facts and Procedural History**

Initially both Leonard and Shirley denied any wrongdoing. Shirley later agreed to cooperate with authorities. According to Shirley, for several months Leonard had planned to destroy the house by fire in a scheme to collect insurance money. At Leonard's urging, Shirley increased the amount of insurance coverage on the contents of the house from $160,000 to $300,000. Leonard then recruited a friend—Gary Thompson—to help set the fire. On a previous occasion Thompson had successfully started a fire in the home of another friend for the purpose of collecting insurance money. In a conversation at Shirley's house, Shirley overheard Leonard and Thompson talking about the thermostat and heard Thompson say they could use the fireplace to start the fire.

The plan was to set the fire Saturday night, October 27, 2012. In preparation, Shirley arranged a hotel room for herself and Leonard at an out-of-town casino and arranged an overnight babysitter for Shirley's daughter. She also boarded her cat at a kennel. As it turned out, the fire did not occur that night. Apparently, Thompson was not able to set it because he had gotten pulled over by a police officer and could not get into Shirley's house.

Their plan having failed, Leonard told Shirley it "ha[d] to be done" and they were "going to do it again[.]" Tr. at 3700. On the evening of November 1, 2012, Leonard's brother Bob Leonard visited Shirley's home. Leonard and Bob spoke and after Bob left Leonard told Shirley that Bob was going to set a small fire so they could collect the insurance money and that they would pay Bob $10,000. Leonard and Thompson cut a piece of cardboard and used it to block the flue to the fireplace chimney so that gas coming from the fireplace would stay in the house. The plan was for a spark from the thermostat to ignite the gas from the fireplace.

Arrangements were made as before: boarding the cat; Shirley's daughter spending the night with friends; and the couple waiting at the casino. The fire was scheduled to occur on Saturday, November 3, 2012. This plan did not work either. However, when speaking on the phone to Mike Duckworth—his friend of twenty years—Leonard told Duckworth that he had been on the internet looking for a Ferrari. When Duckworth asked Leonard how he could afford a Ferrari, anticipating a successful fire, Leonard stated, "[t]sunami winds blew out the fireplace and the house blew up. . . . And they were getting 300,000 dollars." Tr. at 4164.

Leonard continued his efforts to destroy the house. He and Bob went to a local library and researched a fire in a similar sized home. The two also spoke to an employee of the gas company about natural gas, how much it would take to fill up a house, and what would happen to the house when it was full of gas. The employee informed them that the house was "like a balloon, and once it gets full, it's going to blow up." Tr. at 4849.

On Friday, November 9, 2012—for the third weekend in row—Shirley again arranged for a room at the casino, a place for the cat at a kennel, and a babysitter for her daughter. The following evening Shirley and Leonard were seated at the bar inside the casino when she received a telephone call telling her something terrible had happened in her neighborhood and asking if she and her daughter were all right. Shirley then called a neighbor who informed Shirley that her house had exploded and there was nothing left.

Shirley's house was next door to the home of husband and wife Dion and Jennifer Longworth. Their home was also destroyed in the explosion. It was reduced from a two-story

4

residence to a seven-foot pile of rubble. Despite the best efforts of firefighters and neighbors to rescue the couple neither survived. Having been in the upstairs bedroom, Mrs. Longworth died an "almost sudden death" from what the medical examiner referred to as "blast injuries[,]" which means "extensive injury and change of pressure, causing fractures of the skull, fractures of the inner ear, when you have abrupt change of pressure . . . ." Tr. at 1784. The autopsy report revealed Mrs. Longworth suffered significant thermal injuries.

Mr. Longworth survived the initial blast but ended up trapped in the basement of his house. He was alert, relatively uninjured, and communicating with neighbors through a hole in the house at ground level. However, the house was on fire. Firefighters tried to pull Mr. Longworth out of the hole but the fire kept getting closer to where they were working to get him out. The heat became so intense that even wearing protective gear firefighters had to back away. Mr. Longworth sustained thermal injuries and charring over 90% of his body. His ultimate cause of death was inhalation of hot gases and soot, and carbon monoxide poisoning. Both Mr. and Mrs. Longworth had to be identified through their dental records.

On December 20, 2012, the State of Indiana charged Leonard, Shirley, and Bob in a forty-nine count Information. The charges were as follows: Counts I and II Murder, a felony; Count III Conspiracy to Commit Arson as a Class A felony; Count IV Conspiracy to Commit Arson as a Class B felony; Counts V through XVI, Arson as Class A felonies; and Counts XVII through XLIX Arson as Class B felonies. The State later amended the charging Information by adding Count L—an additional charge of Arson as a Class B felony; and Count LI Conspiracy to Commit Insurance Fraud as a Class C felony. Thereafter on February 11, 2013, alleging three aggravating circumstances, the State filed a request seeking life without parole for the murder charges.[1]

---

[1]In exchange for her testimony at Leonard's trial, Shirley entered an agreement with the State in which she pleaded guilty to one count of Conspiracy to Commit Arson as a Class A felony and one count of Conspiracy to Commit Arson as a Class B felony. All remaining charges were dismissed. The agreement called for a sentence of between 20 and 50 years. The record before us does not reveal Shirley's sentence, but public records indicate Shirley was sentenced to 50 years executed in the Department of Correction. See State v. Shirley, 49G03-1212-MR-085548 (Marion Sup. Ct., Crim. Div. 3 Dec. 20, 2016).

Extensive discovery and pre-trial proceedings ensued. After several delays, including a change of venue from Marion County, the guilt phase of Leonard's jury trial began June 4, 2015 and concluded July 14, 2015, generating a twenty-two-volume transcript and over eighteen hundred exhibits. Following the guilt phase of trial the jury found Leonard guilty as charged on all counts. Leonard had previously waived his right to trial by jury for the penalty phase of the trial. Therefore, the trial court conducted a hearing before the bench. It found the State proved each of the three charged aggravating factors beyond a reasonable doubt. The trial court also found the State proved "beyond a reasonable doubt" that the three aggravating circumstances "far outweigh the mitigating circumstances considered." App. at 81. The trial court thus imposed consecutive life without parole sentences for the two murder convictions; and except for Counts IV and V[2] the trial court imposed an aggregate sentence of 75 years on the remaining counts to be served consecutively to the LWOP sentences. This appeal proceeded in due course. Pursuant to Appellate Rule 9(A)(1)(a) the Court has mandatory and exclusive jurisdiction over this appeal. Additional facts are set forth below.

## Discussion

## I.

## Sufficiency of the Evidence

Leonard contends the evidence is not sufficient to sustain the murder convictions. More specifically he argues: (1) the State failed to prove beyond a reasonable doubt that he knowingly killed Dion and Jennifer Longworth; and (2) the State failed to prove the knowing element as to these specific victims. "In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of witnesses." Soward v. State, 716 N.E.2d 423, 425 (Ind. 1999). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict, and we will affirm the convictions if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. Kelly v. State, 719 N.E.2d 391, 394 (Ind. 1999).

---

[2] Because of double jeopardy concerns the trial court entered no judgment of conviction on these two counts—Conspiracy to Commit Arson as a Class A felony and Arson as a Class A felony.

As charged, the State had the burden of proving Leonard knowingly killed Dion and/or Jennifer Longworth. To sustain a verdict, the evidence must show the defendant "was aware of a high probability that someone's death would result from his actions. Because knowledge is the mental state of the actor, the trier of fact must resort to reasonable inferences of its existence." Young v. State, 761 N.E.2d 387, 389 (Ind. 2002).

The record shows the Longworths had lived next door to Shirley since 2003 when her house was first built. The jury could reasonably infer from the circumstances Leonard knew of the proximity between the two homes and that he knew the home next door was occupied, since he had lived with Shirley off and on for eleven months at the time of the explosion. Soon after Leonard moved in with Shirley he began asking about her insurance coverage and then began planning the scheme to defraud the insurance company by damaging the house. Leonard gained Shirley's consent and he recruited others to help ensure they would collect the full $300,000 from the insurance company. Leonard and accomplices attempted unsuccessfully multiple times to destroy the home. After each failure, they increased their efforts to better ensure success. By the time the explosion happened on November 10, the fireplace gas valve and regulator had been reconfigured so gas would flow into the home unimpeded, the chimney was blocked to prevent gas from escaping, the digital thermostat was removed and replaced with a less sophisticated version, and gasoline was poured on the floors in the home. In the library, Leonard also researched the destruction of another home under similar conditions and spoke to a gas company employee about the effects of filling a house with gas. Leonard knew that when a house is filled with enough gas, "[i]t's like a balloon, and once it gets full, it's going to blow up." Tr. at 4849.

The evidence supporting the verdict also shows Leonard knowingly planned for the entire house to be destroyed from the beginning. He told Shirley to remove all her sentimental and valuable items from the home she would like to keep. He also told her that if she "want[ed] that cat," it would have to be put in a kennel. Tr. at 3682. And although Leonard professed to anticipating a "small fire," the jury could reasonably reach the conclusion that an expected $300,000 insurance payout is consistent with a huge explosion rather than a small fire.

7

Leonard also told Duckworth on November 7, before the explosion took place, that he was shopping for a Ferrari with insurance money he received because "[t]sunami winds blew out the fireplace and the house blew up." Tr. at 4164. This circumstantial evidence all points to the fact that Leonard was aware of the magnitude of this explosion, and the jury could reasonably infer Leonard knew death was highly probable.

Further, "[a] knowing killing may be inferred from the use of a deadly weapon in a way likely to cause death." Young, 761 N.E.2d at 389. "Deadly weapon" is defined by statute in part as: "[a] destructive device, weapon, device, taser . . . or electronic stun weapon . . ., equipment, chemical substance, or other material that in the manner it: (A) is used; (B) could ordinarily be used; or (C) is intended to be used; is readily capable of causing serious bodily injury." Ind. Code § 35-31.5-2-86(2). When natural gas is mixed with oxygen and an ignition source, it combusts in a way that is readily capable of causing serious bodily injury. Leonard knew this from his conversation with the gas company employee. He was aware that the house would go "pop" and "blow up" when filled with enough natural gas. He ensured that there would be enough natural gas in the house for it to explode and that there was an ignition source to light the natural gas. Thus, the jury could have reasonably concluded that by filling a house with natural gas and planning for a time-delayed spark by which to start a fire, Leonard acted knowing that his actions had a high probably of resulting in death.

In evaluating other cases to determine if a defendant "knowingly" killed a victim who died in a fire, we have held there was sufficient evidence to support a murder conviction when the defendant started a fire in a house when it was occupied. See Harrison v. State, 644 N.E.2d 1243, 1248 (Ind. 1995) (sufficient evidence was presented that defendant knowingly killed a three-year-old when he started a fire in her bedroom); Garbison v. State, 528 N.E.2d 1126, 1127 (Ind. 1988) (defendant's actions in starting a fire and leaving the burning room where a six-month-old baby slept was sufficient to support a "knowing" murder conviction); Bustamante v. State, 557 N.E.2d 1313, 1321 (Ind. 1990) (holding the jury could reasonably conclude defendant

8

knowingly or intentionally killed his wife when he set fire to their home while she was asleep upstairs).[3]

Although Leonard's victims were not in the same structure as the explosion and resulting fire, the record is clear the homes were in very close proximity—approximately ten feet apart. This increased the likelihood that a fire or explosion in one home would impact the neighboring home. The jury could therefore reach the reasonable conclusion that Leonard "was aware of a high probability that someone's death would result from his actions." Young, 761 N.E.2d at 389.

As for Leonard's contention that the State failed to prove he knowingly killed two specific victims, he insists Indiana Code section 35-41-2-2 demands as much. The statute provides in relevant part:

> (a) A person engages in conduct "intentionally" if, when he engages in the conduct, it is his conscious objective to do so.
>
> (b) A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so.
>
> ***
>
> (d) Unless the statute defining the offense provides otherwise, if a kind of culpability is required for commission of an offense, *it is required with respect to every material element of the prohibited conduct.*

I.C. § 35-41-2-2 (emphasis added). Seizing on the highlighted language Leonard contends that because the "knowing" *mens rea* applies to each element of the offense, and because the identity of each victim is an element of the crime, it follows that the State is required to prove beyond a reasonable doubt that Leonard knowingly killed Mr. and Mrs. Longworth. We disagree with Leonard's reading of the statute.

---

[3]Accord People v. Howery, 687 N.E.2d 836, 857 (Ill. 1997) (convictions for knowing murder were supported by sufficient evidence where investigators determined two separate fires were started in lower levels of a home and the children who were sleeping upstairs were killed); State v. Joy, 452 A.2d 408, 412 (Me. 1982) (holding the evidence was sufficient to support a knowing or intentional killing where the defendant set fire to Christmas trees outside an apartment and an occupant of the building died).

"When construing a statute our primary goal is to ascertain the legislature's intent. To discern that intent, we look first to the statutory language itself and give effect to the plain and ordinary meaning of statutory terms." Suggs v. State, 51 N.E.3d 1190, 1193 (Ind. 2016) (citation omitted). Here, under the plain language of subsection (d) the State is required to prove culpability ("knowingly") "with respect to every material element of the *prohibited conduct*." I.C. § 35-41-2-2(d) (emphasis added). Though the victims' identities were material elements of the offense, the identities are not part of the prohibited conduct. See Owens v. State, 742 N.E.2d 538, 543 (Ind. Ct. App. 2001) ("In Markley [v. State, 421 N.E.2d 20, 21 (Ind. Ct. App. 1981)] we noted that 'prohibited conduct' and 'element' within Ind. Code § 35-41-2-2(d) are not synonymous and if the legislature had intended culpability to apply to every material element, the phrase 'of the prohibited conduct' would be superfluous.").

By contrast, taken to its logical conclusion Leonard's argument would mean that someone who planted an explosive device under a car, set it on a timer, and walked away would not be held responsible if a passerby were fatally injured by the explosion because the person did not know who the victim would be. We are not persuaded the legislature intended such a result. In summary, we conclude the evidence in this case is sufficient to sustain Leonard's convictions for murder, a Felony, as alleged in Counts I and II of the charging Information.[4]

## II.
### Aggravating Circumstances

The State sought life without parole based on three aggravating circumstances: "[t]he defendant committed the murder by the unlawful detonation of an explosive with intent to injure a person or damage property," I.C. § 35-50-2-9(b)(2); "[t]he defendant has committed another murder, at any time, regardless of whether the defendant has been convicted of that other

---

[4] The record shows the trial court instructed the jury on the option of returning a verdict of reckless homicide as a lesser included offense of murder. See App. at 2981-82. During final summation defense counsel argued to the jury: "If you were to come back and find Mr. Leonard guilty of reckless homicide and conspiracy . . . I don't know that I would have much to say about that." Tr. at 5175-76. Obviously the jury rejected this argument.

murder," I.C. § 35-50-2-9(b)(8);[5] and "[t]he defendant burned, mutilated, or tortured the victim while the victim was alive," I.C. § 35-50-2-9(b)(11) (2012). The State must prove the existence of an aggravator beyond a reasonable doubt. Leonard challenges only the (b)(11) aggravating circumstance contending the State failed to prove this aggravator "beyond a reasonable doubt, or by any standard, because it presented no proof that Leonard intentionally burned Mr. Longworth." Appellant's Br. at 31.

"A sentence of life without parole is subject to the same statutory standards and requirements as the death penalty." Treadway v. State, 924 N.E.2d 621, 637 (Ind. 2010). The death penalty statute provides: "If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing. If the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing." I.C. § 35-50-2-9(d). Here the guilt phase of trial was decided by a jury. And ordinarily the trial court would reconvene the jury to hear the sentencing phase of trial. However, five days before the guilt phase of trial concluded, Leonard submitted and the trial court accepted his written "Waiver of Jury Trial for Phase II/LWOP" proceedings. App. at 3093-95; Tr. at 5246-49. The waiver provided in part: "The Accused has been informed that the Judge of this case will ultimately impose any penalty. . . . After consultation and reflection, the Accused knowingly and intelligently waives his right to have this jury determine the questions presented in any LWOP Phase of this trial." Id.

Essentially, Leonard triggered the clause in the death penalty statute declaring "the court alone shall conduct the sentencing hearing." I.C. § 35-50-2-9(d). And where "the hearing is to the court alone, except [for provisions not relevant here], the court shall: . . . impose a term of life imprisonment without parole; only if it makes the findings described in subsection (l)." I.C. § 35-50-2-9(g)(2). In turn, subsection (l) provides in pertinent part:

> Before a sentence may be imposed under this section . . . the court, in a
> proceeding under subsection (g), must find that: (1) the state has proved beyond
> a reasonable doubt that at least one (1) of the aggravating circumstances listed in

---

[5] This aggravator is applicable only in "cases involving double or multiple murders for which the defendant is being tried in one proceeding." Isom v. State, 31 N.E. 3d 469, 477 n.2 (Ind. 2015) (quoting Hough v. State, 560 N.E.2d 511, 519 (Ind. 1990)).

11

subsection (b) exists; and (2) any mitigating circumstances that exist are outweighed by the aggravating circumstances.

I.C. § 35-50-2-9(l).

We pause here to note the State is required to prove "beyond a reasonable doubt that *at least one (1) of the aggravating circumstances* listed in subsection (b) exists" and that the mitigating circumstances are outweighed by the aggravating circumstances. I.C. § 35-50-2-9(1) (emphasis added). Here, the trial court found the State had proven all three aggravators beyond a reasonable doubt. The trial court also found the aggravating circumstances "far outweigh the mitigating circumstances considered." App. at 81.

On appeal, except for the (b)(11) aggravating factor, Leonard does not challenge the trial court's findings. Thus, even if the trial court erroneously found the State proved the (b)(11) aggravator beyond a reasonable doubt, any error would be harmless beyond a reasonable doubt. Leonard would still be subject to consecutive life without parole sentences. This is so because of the remaining two valid aggravating circumstances and the trial court's finding that the aggravators outweigh the mitigators. But for reasons explained below we discern no error.

With respect to the (b)(11) aggravator the trial concluded:

[Dion] Longworth survived the explosion, but was killed in the ensuing fire. He died as a result of hot gas and soot inhalation and was burnt while alive and his body was mutilated in the fire. Inasmuch as the fire which killed [Dion] Longworth was a direct result of the explosion at 8349 Fieldfare Way, the Court finds that the State has proven, beyond a reasonable doubt, [this aggravating circumstance].

App. at 80. Leonard contends this Court's opinion in Nicholson v. State, 768 N.E.2d 443 (Ind. 2002) requires the State to prove he *intentionally* burned Dion Longworth. In Nicholson, the defendant was charged with torturing his victim while the victim was alive. We concluded:

[P]roof of infliction of severe physical or mental pain . . . . alone surely cannot be sufficient. If such were the case, any stabbing or shooting victim would also be tortured. The other aggravators listed in Ind.Code Ann. § 35-50-2-9(b)(11), 'burned' and 'mutilated,' further suggest that the legislature intended something

more than simply the infliction of severe physical or mental pain to satisfy the torture aggravator.

We conclude that the torture aggravator requires something more: an appreciable period of pain or punishment intentionally inflicted and designed either to coerce the victim or for the torturer's sadistic indulgence.

Id. at 447. Leonard couples his argument with the structure of the statute to argue that we must read a requirement of intent into the "burned" aggravator also. We decline to expand the holding of Nicholson, construing torture to the meaning of burned. In that case the Court looked to the definition of "torture" in the Webster's Third New International Dictionary to conclude that torture included an intent behind the acts. But applicable here the definition of "burn" contains no such intent. See Webster's Third New International Dictionary 299 (1993) (defining "burn" in part as "to injure by fire or heat: alter a property of by undue exposure to fire or heat : SCORCH, SCALD, BLISTER, SEAR, SINGE, CHAR"). Leonard also argues that intentionality must be proven because:

The sentence uses active rather than passive voice. The "defendant" is the subject of the sentence – the actor. The "victim" is the object of the sentence. He is the one being acted upon by the subject. Thus, it cannot be that the defendant caused the victim to be burned, but rather that the defendant actively burned the victim.

Appellant's Br. at 83. The State counters that this reading of the statute would create an absurd result, because "setting a fire to a residence by torch and burning a family alive would not satisfy his interpretation of the statute; he would need to actively and personally burn each member of the family while alive.[]" Br. of Appellee at 65. We agree with this reasoning and ultimately conclude the trial court properly found the State proved the (b)(11) aggravator beyond a reasonable doubt.

13

## III.

## Admissibility of Out of Court Statement

Alleging a Sixth Amendment violation Leonard contends the trial court abused its discretion by admitting his out of court statement into evidence.[6] The facts underlying Leonard's claim are these. Sometime after Leonard was charged with the instant offenses and taken into custody, he was placed in the same maximum security cellblock in the Marion County jail as Robert Smith. Smith, a serial Marion County jail resident, had been incarcerated on several prior occasions for various offenses. On this occasion he was incarcerated on a charge of a probation violation and escape as a class D felony. Smith had been working as a police informant since 1985. After being placed in the cellblock with Smith, Leonard started talking to Smith and over time the two men had several conversations about Leonard's case. With respect to the explosion Leonard told Smith, among other things, that he and his girlfriend Shirley went to a casino, and his brother Bob was supposed to step on a gas line and crack it, but he put too much weight on it and broke it off. Bob shut all the curtains to the house and then used the microwave as a timer. The insurance proceeds were supposed to be $300,000. Later, Leonard told Smith that Mark Duckworth was supposed to be a State's witness against him and that Duckworth was lying and trying to get him sent to prison for life. Leonard wanted Duckworth killed and was willing to pay a fee to make it happen. Leonard asked Smith if he knew anyone who could kill Duckworth, and Smith replied that he would find someone.

Smith's plan however was to inform law enforcement about what Leonard had told him. Smith hoped to get paid for providing information about Leonard.[7] Smith wrote a letter to Corey McGriff, a Marion County deputy sheriff who had previously worked with Smith. The letter informed Deputy McGriff that Leonard had approached him about having Duckworth killed for $15,000 and that he was going to have Leonard sign a contract and draw a map. Thereafter Smith sent a second letter to Deputy McGriff which included a handwritten map to Duckworth's

---

[6] At trial Leonard did not raise a Sixth Amendment violation when challenging the introduction of his statement into evidence. Instead he argued a violation of Article 1, Section 13 of the Indiana Constitution. He does not advance this argument on appeal. The State does not argue waiver; instead it addresses Leonard's Sixth Amendment claim on the merits. We do the same.

[7] Ultimately Smith received a bond reduction and release pending the escape charge. App. at 2409.

14

residence with a notation of "agree payment 180 days upon release" and included Leonard's signature. App. at 2416.

The letters were eventually passed on to Detective Jeff Wager, the lead investigator in Leonard's case. He decided to investigate Leonard's plot to kill Duckworth. Detective Wager and Sergeant Stefan Crooke met with Smith and told him not to talk with Leonard about the explosion and only to discuss his plot to have Duckworth killed. The officers provided Smith with the name "Jay"—the purported hit man—and a phone number to pass on to Leonard. "Jay" was actually Special Agent Jeremy Godsave, a special agent with ATF, one of the agencies investigating the explosion. Smith passed along the information to Leonard and gave Leonard his own PIN so that Leonard could use it when calling from the jail. This was done in order that the calls would be associated with Smith and not Leonard. On his own accord and with no prompting from Smith, Leonard placed two calls to "Jay." In both conversations Leonard expressed a desire to have Duckworth killed, admitted he had drawn the map to Duckworth's residence, and gave Jay specific directions. For reasons not apparent from the record before us, Leonard believed that killing Duckworth would get him out of jail.[8]

Prior to trial Leonard moved to suppress his statements both to Smith as well as the phone calls to Special Agent Godsave. Following briefing and a hearing the trial court denied the motion. At trial, over Leonard's objection, the statements were introduced into evidence. In this appeal Leonard challenges only the admission of his recorded phone calls made to "Jay"— Special Agent Godsave. According to Leonard these calls "were deliberately elicited by the State after he had been charged in this case and his right to counsel had attached" and thus should not have been admitted at trial. Br. of Appellant at 29.

The Sixth Amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. A criminal defendant's Sixth Amendment right to counsel is a fundamental individual right that is "made obligatory upon the States by the Fourteenth Amendment."

---

[8] Under a separate cause number from the instant offenses Leonard was subsequently charged with conspiracy to commit murder as a Class A felony. App. at 1261.

<u>Gideon v. Wainwright</u>, 372 U.S. 335, 342 (1963). This right attaches when "a prosecution is commenced." <u>Rothgery v. Gillespie Cnty.</u>, 554 U.S. 191, 198 (2008) (observing "[w]e have, for purposes of the right to counsel, pegged commencement to the initiation of adversary judicial criminal proceeding—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment" (internal quotation omitted)).

There is no dispute that Leonard's right to counsel in this case ("the explosion case") attached on December 20, 2012, when charges were filed against him. But the federal circuits appear divided on the question of whether a defendant's voluntary statements—made after his Sixth Amendment rights have attached for one offense—about a separate offense for which he had not yet been charged are admissible in the trial of the first offense.[9] And the U.S. Supreme Court has not directly addressed the issue. Nonetheless our analysis is informed by the Court's opinion in <u>Texas v. Cobb</u>, 532 U.S. 162 (2001).

In <u>Cobb</u>, the defendant was indicted for burglary and counsel was appointed to represent him. Thereafter, questioned by police, defendant confessed to murdering his wife and daughter during the burglary. Thereafter defendant was charged with and convicted of capital murder and sentenced to death. On appeal he argued that his right to counsel attached when counsel was appointed in the burglary case and the police were therefore required to secure counsel's permission before proceeding with the interrogation. The Supreme Court observed that in a divided opinion the Texas Court of Criminal Appeals reversed the conviction holding, "once the right to counsel attaches to the offense charged, it also attaches to any other offense that is very closely related factually to the offense charged." <u>Id.</u> at 166-67. Finding the capital murder charge to be "factually interwoven with the burglary" the Texas Court of Criminal Appeals

_____

[9] <u>Compare</u> <u>United States v. Bender</u>, 221 F.3d 265, 269 (1st Cir. 2000) (While incarcerated for one offense, defendant made incriminating statements about another, yet to be charged offense. The Court held: "The statements were incriminating not only as to future crimes (perjury, conspiracy to kidnap and murder) but also as to the pending charges. So long as the statements were incriminating as to the pending charges and were deliberately elicited by government agents, they cannot constitutionally be admitted in the trial of those charges."); <u>with</u> <u>United State v. Mir</u>, 525 F.3d 351, 356 (4th Cir. 2008) (Indicted for labor related fraud charge, defendant was believed to be engaged in witness tampering. With the use of confidential informants the government recorded several of the defendant's conversations, and they were admitted at trial over the defendant's objection. The Court declared "no Sixth Amendment right had attached" to conversations that related to completely different offenses for which no charges had yet been filed.).

concluded defendant's Sixth Amendment right attached to the capital murder charge even though defendant had not yet been charged with that offense. Id. at 167.

Although granting certiorari to address specifically whether the Sixth Amendment right to counsel extends to crimes that are "factually related" to those that have been actually charged—a point not at issue in the case before us—the Supreme Court declared:

> The Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

> Accordingly, we [have] held that a defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses.

Id. at 167-68 (alteration in original) (citation and internal quotation omitted). The Court further elaborated:

> The police have an interest in the thorough investigation of crimes for which *formal charges* have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and *formally charged* with having committed another crime obviously seek to discover evidence useful at a trial of either crime. In seeking evidence pertaining to *pending charges,* however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. . . . On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

Id. at 170-71 (quotation omitted).

The Cobb Court appears to make plain that Leonard's phone calls to Special Agent Godsave were not protected by Leonard's Sixth Amendment right to counsel. This right attached to the explosion case for which charges had already been filed. It did not attach to an offense "for which he had not been charged" and thus "were admissible notwithstanding the

17

attachment of his Sixth Amendment right to counsel on other charged offenses." Id. at 168.[10] Leonard does not dispute that the two phone calls he made to the presumptive "hit man" made no reference whatsoever to Leonard's pending case. Rather, in both conversations Leonard expressed a desire to have Duckworth killed and admitted he had drawn the map to Duckworth's residence. No prosecution on this alleged offense had begun at the time. "The Sixth Amendment right [to counsel] . . . is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced." Id. at 167.

A trial court has broad discretion in ruling on the admissibility of evidence and we will disturb the court's ruling only where it is shown the court abused that discretion. Turner v. State, 953 N.E.2d 1039, 1045 (Ind. 2011). "But where, as here, a constitutional violation is alleged, the proper standard of appellate review is de novo." Speers v. State, 999 N.E.2d 850, 852 (Ind. 2013), cert. denied 134 S.Ct. 2299 (2014). Here, upon de novo review, we conclude the trial court properly admitted evidence of the phone conversations between Leonard and Special Agent Godsave.

## IV.
### Constitutionality of Indiana's Life Without Parole Statute

Leonard challenges as unconstitutional Indiana's life without parole statutory sentencing scheme. According to Leonard this is so because the statute does not require the jury, or as in this case the trial court, to find that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. We rejected this precise argument in Isom v. State, 31 N.E.3d 469, 487-88 (Ind. 2015), cert. denied, 136 S. Ct. 1161 (2016),[11] and before that Ritchie v.

---

[10] See also U.S. v. Moschiano, 695 F.2d 236, 242 (7th Cir. 1982) (Adhering to the distinction between post-indictment incriminating statements relating to new criminal acts and post indictment statements constituting admissions of past wrong doing. Only the "latter type of statements are generally not admissible at trial on the pending indictment because they do not represent or evidence the commission of a separate crime and because they are the kind of utterances for which the assistance of counsel could legitimately play a useful role.").

[11] Seeking certiorari, Isom's single question presented was: "Whether the determination that aggravating circumstances outweigh mitigating circumstances must be made by a unanimous jury, beyond a reasonable doubt?" Pet. for Writ of Cert. at i.

State, 809 N.E.2d 258, 266 (Ind. 2004) (noting the Court had previously concluded "as a matter of state law, that the determination of the weight to be accorded the aggravating and mitigating circumstances is not a 'fact' which must be proved beyond a reasonable doubt but is a balancing process" (alteration and quotation omitted)); see also State v. Barker, 809 N.E.2d 312, 315 (Ind. 2014) (declaring, "[b]ecause there is no constitutional requirement that the weighing factor be found beyond a reasonable doubt, the omission of such a requirement in the Indiana death penalty statute does not violate the constitution"). Recently, the United States Supreme Court issued its decision in Hurst v. Florida, 577 U.S. ___, 136 S. Ct. 616 (2016). Leonard contends Hurst dictates we revisit our existing precedent.

In Hurst the Court reviewed Florida's death penalty statutory scheme in which the jury provided the trial court a non-binding advisory verdict, but the trial court made the ultimate sentencing determination. Writing for a seven-person majority, Justice Sotomayor declared the Court's holding at the beginning of the opinion: "We hold [Florida's] sentencing scheme unconstitutional. The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death. A jury's mere recommendation is not enough." Hurst, 136 S.Ct. at 616.

According to Leonard "Hurst stands for the proposition that before a capital defendant in Florida may be sentenced to death, *a jury must find beyond a reasonable doubt* that sufficient aggravating circumstances exist and that there are insufficient mitigating circumstances to outweigh the aggravating circumstances." Appellant's Br. at 65 (emphasis added) (quoting Hurst, 136 S.Ct. at 622) (alteration and quotation omitted). Even assuming the rationale of Hurst—a death penalty case—is applicable in the life without parole case before us, we nonetheless disagree with Leonard's reading of Hurst. Importantly, the opinion did not hold that weighing must be done beyond a reasonable doubt. Indeed Hurst says nothing at all about whether the weighing of aggravating and mitigating circumstances must be determined beyond a reasonable doubt. And Leonard points to no such discussion. Instead he parses the language of Hurst to infer the Court's meaning. But "[c]onstitutional rights are not defined by inferences from opinions which did not address the question at issue." Cobb, 532 U.S. at 169. In sum we are not persuaded that Indiana's life without parole statutory sentencing scheme is

unconstitutional. And we disagree that <u>Hurst</u> demands we revisit our existing precedent which is still good law and controls the outcome of this issue.

## Conclusion

We conclude the evidence in this case is sufficient to sustain the murder convictions; the State proved the (b)(11) aggravator beyond a reasonable doubt; the trial court did not abuse its discretion in admitting the recorded statement into evidence; and Indiana's life without parole statute is not unconstitutional. We therefore affirm Leonard's convictions and sentences.

Rush, C.J., and David, Massa and Slaughter, JJ., concur.