## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 04 2017, 9:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jane H. Ruemmele
Hayes Ruemmele, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jackie Lynn Rolston,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

August 4, 2017

Court of Appeals Case No.
20A04-1701-CR-54

Appeal from the Elkhart Superior Court

The Honorable Teresa L. Cataldo, Judge

Trial Court Cause No.
20D03-1503-F2-2

**Najam, Judge.**

## Statement of the Case

Jackie Lynn Rolston appeals her conviction, following a jury trial, for battery, as a Level 2 felony, and her sentence. Rolston raises the following three issues for our review:

> 1. Whether the trial court erred when it admitted certain photographs into evidence.
>
> 2. Whether the State presented sufficient evidence to support her conviction.
>
> 3. Whether her sentence is inappropriate in light of the nature of the offense and her character.

We affirm.

## Facts and Procedural History

K.C. was born on March 17, 2013, to Anissa Garza and her boyfriend, Cody Coleman. Throughout the majority of K.C.'s life, he and Anissa lived with Anissa's parents, Tony Garza and Angie Garza. In December of 2013, Anissa hired Rolston to babysit K.C.

In September of 2014, Angie picked up K.C. from Rolston's home and observed that K.C. had a bloody mouth and a bruise on the middle of his forehead. Rolston stated that K.C. had run into a wall while carrying a sippy cup. The next month, K.C. came home with a bruise on his "whole" right cheekbone. Tr. Vol. IV at 108. Rolston stated that K.C. had been hit with a toy

firetruck by one of the other children. On Monday, October 27, Angie observed K.C. "limping" after having been in Rolston's care. Tr. Vol. III at 227-28. The next day while in Rolston's care, K.C. vomited for no apparent reason and soiled his clothes, which was highly abnormal for K.C. That evening, Angie observed that K.C. was abnormally tired after he had come home from being in Rolston's care. Similar events did not happen to K.C. while he was in the care of Anissa, Angie, or Tony.

[5] Around 5:30 the next morning, Wednesday, October 29, Anissa dropped K.C. off with Rolston while on the way to work. K.C.'s behavior that morning was normal. His coordination was normal, he was verbalizing normally, and he had no notable injuries. As Tony described K.C. that morning, "he was fine." Tr. Vol. IV at 83.

[6] At approximately 11:30 that morning, about six hours after Anissa had dropped off K.C., Rolston gave K.C. some scrambled eggs for lunch and had K.C. feed himself. But, almost immediately after, she called 9-1-1 and reported that K.C. was choking. Rolston's husband, Richard, a local volunteer firefighter, heard the call over the radio and his address. He was the first to arrive on the scene. When he arrived, K.C. was lying unresponsive on the floor. Richard observed that K.C. had no blockage of his airway or other indication of choking. Nonetheless, Richard, and, later, numerous other responders, attempted without success to resuscitate K.C.

[7] Paramedics transported K.C. to Goshen Hospital, where he was pronounced dead. Dr. Andre Hischler observed K.C. as K.C. was brought into the emergency room. Dr. Hischler did not observe bruises or other indicia of trauma at that time. However, later that day when Anissa, Angie, and Tony were allowed to view K.C.'s body, scratches, "bumps[,] and bruises . . . were visually noticeable" on K.C.'s face and hands. *Id.* at 84. Tony immediately thought something "was amiss" and that K.C.'s death had not been "a freak accident" based on "the way [K.C.] looked." *Id.* at 83-84. Dr. Hischler later suggested that the appearance of trauma on K.C.'s face and hands after Dr. Hischler had observed K.C. in the emergency room would have been consistent with trauma that had been caused at a time very near K.C. being transported to the emergency room. *See id.* at 59-61.

[8] Dr. Joseph Prahlow, a forensic pathologist, performed K.C.'s autopsy. Dr. Prahlow has performed more than 5,000 autopsies and has more than 100 peer-reviewed publications. Dr. Prahlow immediately observed multiple bruises and "excoriations of [K.C.'s] face" and lips, some of which had begun healing, which suggested multiple injuries at different times. *Id.* at 215. Dr. Prahlow then observed numerous abrasions to the back of K.C.'s head. Dr. Prahlow concluded that, based on their severity, those particular injuries were related to K.C.'s internal head injuries, which are described below, and "weren't incidental" or "little boy toddler type" injuries. *Id.* at 222.

[9] Dr. Prahlow then performed the internal examination of K.C.'s skull and brain. That examination revealed subscapular hemorrhages. It also revealed "a great

deal of . . . fresh subdural blood, liquid[,] runny blood," on K.C.'s brain as well as contusions on K.C.'s brain. *Id.* at 242. As Dr. Prahlow described: "much of [what is on K.C.'s brain] is liquid blood. . . . This is not normal. This should not be here at all. . . . This is evidence of trauma . . . ." *Id.* at 239. Dr. Prahlow described that trauma as "significant" and the cause of K.C.'s death. *Id.* at 243-44. During the course of the autopsy, Dr. Prahlow also discovered evidence of prior brain bruising and blood on K.C.'s brain, which injuries Dr. Prahlow concluded K.C. had suffered at least two to three days prior to the fatal injury.

[10]   The victim of such head injuries, according to Dr. Prahlow, would have likely demonstrated symptoms of neurological malfunction nearly immediately after the injuries. Such symptoms could have included vomiting, sleepiness, and disorientation. Given the severity of K.C.'s fatal injury, Dr. Prahlow concluded that, within minutes of having received that injury, K.C. would not have been able to exercise the fine motor control necessary to feed himself. *See* Tr. Vol. V at 4.

[11]   Finally, Dr. Prahlow's examination revealed a substance consistent with scrambled eggs in K.C.'s stomach, but Dr. Prahlow discovered no evidence of injury or blockage to K.C.'s ability to breathe. In light of his examination and the circumstances surrounding K.C.'s death, Dr. Prahlow concluded that K.C. had died of blunt force trauma to the head, and that K.C.'s fatal injury had occurred "minutes" prior to his death. *Id.* at 7.

[12] On March 20, 2015, the State charged Rolston with battery, as a Level 2 felony. Angie, Tony, Anissa, Richard, Dr. Hischler, and Dr. Prahlow all testified at Rolston's ensuing jury trial. During his testimony, Dr. Hischler stated that, after he had pronounced K.C. dead at Goshen Hospital, he decided to review K.C.'s medical history. Dr. Hischler did so because, in his experience, a child who is choking will regain the ability to breathe once the child's airway is clear, which was not consistent with Rolston's report that K.C. had been choking and the first responders' reports that K.C.'s airway showed no blockage.

[13] In the course of his testimony, Dr. Prahlow referenced numerous autopsy photographs, which were admitted into the record without objection by Rolston. And, in describing the force necessary to create an injury of the severity K.C. incurred, Dr. Prahlow testified as follows:

> Q       How would you describe the force necessary to inflict this type of an injury on K.C.'s brain?
>
> A       Well, I can't put it in, like, pounds per square inch or anything like that. I would say significant, more than just incidental bumps or falls.
>
> Q       Okay. Something that maybe a two-and-a-half or three-year-old could do to another child?
>
> A       It depends on what you're talking about. Pushing someone off of a balcony, I think a three-year-old could do that to a nineteen-month-old and the person would land on their head so, yes—

Q     Okay.

A     —within the realm of possibilities.

Q     What about just maybe a hit by a three-year-old?

A     One of the things we are taught is to never say never. So is it within the realm of possibilities? I suppose, but I've never seen such a case.

*Id.* at 6. The State also sought to have admitted, over Rolston's objection, a photograph of K.C. that showed him three days before his death. The trial court admitted that photograph after expressly finding that its probative value was not substantially outweighed by the danger of unfair prejudice to Rolston.

[14]    A jury found Rolston guilty as charged. The trial court entered its judgment of conviction and, thereafter, imposed a sentence of thirty years, with two years suspended to probation. In sentencing Rolston, the court stated:

> the court notes aggravating circumstance[s] in that the victim of the offense was less than 12 years of age at the time [Rolston] committed the offense; the child was 18 months old and entrusted to [Rolston's] care; [Rolston] has a history of criminal behavior in that [she] had another child [who] was harmed while in her care; not an isolated incident but a pattern and a pattern that culminated in the death of a child. However, the court finds that the aggravating circumstances in this case were extremely egregiious [sic] and make[s] a record; the pathologist who very skillfully and painstakingly went through the evidence that was found on the victim's body and through scientific methods determined that the injuries sustained by the victim were less than two hours old; and in his opinion it could have happened

immediately after the injury was sustained. Uncontroverted evidence in this case shows that the only adult who was with the victim in the immediate two hours prior to this incident was [Rolston]. That due to the evidence that was presented, the idea that the victim was choking was not substantiated in any way by that evidence presented at trial as being the cause of his death. The pathologist indicated that the force of the effect of the blunt force trauma to his head resulted in a loss of electrical impulses emitting through the child's brain; the result of which periodically shut down all his physical functions and organs. In rending this sentence the court does not in any way make a judgment as [to Rolston's] character or her loving nature; but the court is tasked with examining all evidence and deciding who's actions resulted in the death of the child.

Appellant's App. Vol. II at 6. This appeal ensued.

# Discussion and Decision

## *Issue One: Admission of Photographs*

[15] On appeal, Rolston first asserts that the trial court erred both when it admitted the photograph of K.C. from three days before his death and when it admitted certain autopsy photographs. We address each challenge in turn.

### Photograph of K.C. Prior to His Death

[16] The trial court admitted, over Rolston's objection, a photograph of K.C. that showed him three days before his death. The trial court has "inherent discretionary power on the admission of evidence, and its decisions are reviewed only for an abuse of that discretion." *McManus v. State*, 814 N.E.2d 253, 264 (Ind. 2004) (internal quotation marks omitted). An abuse of discretion

occurs when the trial court's judgment "is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights." *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014).

[17] According to Rolston, the trial court erred when it found that the probative value of the photograph was not substantially outweighed by the danger of unfair prejudice to Rolston. Indiana Evidence Rule 403 states that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." In a recent opinion, the Indiana Supreme Court explained the trial court's broad discretion to apply Rule 403:

> "Trial judges are called trial judges for a reason. The reason is that they conduct trials. Admitting or excluding evidence is what they do." *United States v. Hall*, 858 F.3d 254, 288 (4th Cir. 2017) (Wilkinson, J., dissenting). That's why trial judges have discretion in making evidentiary decisions. This discretion means that, in many cases, trial judges have options. They can admit or exclude evidence, and we won't meddle with that decision on appeal. *See Smoote v. State*, 708 N.E.2d 1, 3 (Ind. 1999). There are good reasons for this. "Our instincts are less practiced than those of the trial bench and our sense for the rhythms of a trial less sure." *Hall*, 858 F.3d at 289. And trial courts are far better at weighing evidence and assessing witness credibility. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). In sum, our vantage point—in a "far corner of the upper deck"— does not provide as clear a view. *State v. Keck*, 4 N.E.3d 1180, 1185 (Ind. 2014).

\* \* \*

> The unfair prejudice from [the challenged evidence] . . . was not
> so high that it overrode the trial court's wide discretion. *See*
> *Dunlap[ v. State]*, 761 N.E.2d [837, 842 (Ind. 2002)]. We thus
> decline to second-guess the trial court's determination that the
> [evidence's] relevance . . . was not substantially outweighed by
> the danger of unfair prejudice. The trial court could have
> admitted or excluded the [evidence]. The trial court chose
> admission . . . .

*Snow v. State*, ___ N.E.3d ___, 2017 WL 2687410, at *4, *6 (Ind. June 22, 2017).

[18] Contrary to Rolston's assertions on appeal, the photograph was relevant to show K.C. in a recent and uninjured condition prior to his death by blunt force trauma to the head. Moreover, any danger of unfair prejudice from that relevant evidence was not so high that it overrode the trial court's discretion under Rule 403. *See id.* Accordingly, the trial court acted within its discretion when it admitted the photograph, and we will not second-guess the court's exercise of that discretion.

## Autopsy Photographs

[19] Rolston also asserts that the trial court erred when it admitted numerous photographs of K.C.'s body during the autopsy. As Rolston did not object to the admission of those photographs during her trial, on appeal she must show that the admission of those photographs was fundamental error, which is an "extremely narrow" basis for appellate review that requires Rolston to bear "the heavy burden of showing that a fair trial was [made] impossible" by the

purportedly erroneous admissions. *Harris v. State*, 76 N.E.3d 137, 139 (Ind. 2017).

[20] As an initial matter, Rolston's claim of fundamental error is not available to her. She did not merely fail to object to the admission of the now-challenged autopsy photographs; rather, she affirmatively declared that she had "no objection" to them. *E.g.*, Tr. Vol. IV at 205-06. As the Indiana Supreme Court has explained:

> The appellant cannot on the one hand state at trial that he has no objection to the admission of evidence and thereafter in this Court claim such admission to be erroneous. . . . [T]he doctrine of fundamental error is inapplicable to the circumstances presented here. The doctrine presupposes the trial judge erred in performing some duty that the law had charged the judge with performing *sua sponte*. Presumably a trial judge is aware of her own *sua sponte* duties. But upon an express declaration of "no objection" a trial judge has no duty to determine which exhibits a party decides, for whatever strategic reasons, to allow into evidence. Only the interested party himself can really know whether the introduction or exclusion of a particular piece of evidence is in his own best interests.

*Halliburton v. State*, 1 N.E.3d 670, 677 (Ind. 2013) (internal quotation marks, alterations, and citations omitted). Accordingly, Rolston's claim of fundamental error must fail.

[21] In any event, Rolston has not met her burden to show any error, let alone fundamental error, in the admission of the autopsy photographs. Rolston generally asserts that the autopsy photographs were "gruesome" and

"unnecessary." Appellant's Br. at 17. Rolston also notes that "autopsy photographs are generally inadmissible if they show the body in an altered condition." *Allen v. State*, 686 N.E.2d 760, 776 (Ind. 1997).

[22] However, the Indiana Supreme Court has acknowledged that "there are situations where some alteration of the body is allowed where necessary to demonstrate the testimony being given." *Halliburton*, 1 N.E.3d at 677 (internal quotation marks omitted). Indeed, the court has expressly held that autopsy photographs that showed "the victim's skull with the hair and skin pulled away from it" were admissible "[b]ecause the pathologist had explained what he had done and the alteration was necessary to determine the extent of the victim's injuries." *Id.* (discussing *Fentress v. State*, 702 N.E.2d 721, 722 (Ind. 1998)).

[23] The same is true here. The autopsy photographs of K.C.'s altered body were necessary to demonstrate Dr. Prahlow's testimony, in which he explained what he had done during the autopsy and that the alterations were necessary to determine the extent of K.C.'s injuries. As such, Rolston has not shown any error in the admission of the autopsy photographs, let alone fundamental error. *See id.*

### Issue Two: Sufficiency of the Evidence

[24] Rolston next challenges the sufficiency of the evidence underlying her conviction for battery, as a Level 2 felony. Our standard of review is clear: in reviewing such claims, we will consider only the evidence most favorable to the verdict and the reasonable inferences to be drawn therefrom. *Leonard v. State*,

73 N.E.3d 155, 160 (Ind. 2017). We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.* We will neither reweigh the evidence nor reassess the credibility of witnesses. *Id.*

[25] To show that Rolston committed battery, as a Level 2 felony, the State was required to prove beyond a reasonable doubt that Rolston was at least eighteen years of age when she knowingly or intentionally touched K.C., who was less than fourteen years of age, in a rude, insolent, or angry manner, which resulted in K.C.'s death. Ind. Code § 35-42-2-1(j)(1) (2014). Rolston contends that the State's evidence against her amounts to showing only that she was in the presence of K.C. when he died. Rolston asserts that "[t]he timing of the child's fatal injury . . . was not clearly established"; "[n]o one testified that the child was ever injured by them or in their presence"; "there was no affirmative proof of an act committed by anyone"; "the State never proved that Rolston committed a battery on the child"; and "[t]he State never even proved that the injuries were the result of a battery." Appellant's Br. at 20-21. Rolston further avers that "[t]he State failed to rule out the possibility that K.C. was . . . injured . . . by one of the other children . . . ." *Id.* at 27. We reject Rolston's reading of the record.

[26] The evidence most favorable to the verdict supports Rolston's conviction. Rolston admitted that she was the only adult with K.C. at the time of his death. She further admitted that she had given K.C. scrambled eggs to feed himself shortly before his death. Dr. Prahlow unambiguously testified that, based on

the severity of K.C.'s injuries, K.C.'s death most likely happened within minutes of the injury having been inflicted. Dr. Prahlow further explained that almost immediately after suffering the injury K.C. would have lost the fine motor skills necessary to feed himself. Yet, Dr. Prahlow discovered scrambled eggs in K.C.'s stomach during the autopsy. The State's evidence unmistakably puts K.C.'s time of death after he had already fed himself some of his scrambled eggs, which was only minutes before Rolston called 9-1-1.

[27] Dr. Prahlow further testified that the fatal injuries were significant traumas, were not incidental injuries, and were not consistent with injuries that result from normal toddler behavior. He expressly testified that a two- or three-year old child, such as those with K.C. at the time of his death, would not have been likely to inflict such injuries absent perhaps pushing the victim off of a balcony. Thus, the State's evidence puts the force necessary to inflict the fatal injuries in the range of that possible only by an adult, and, again, Rolston was the only adult present.

[28] The State's evidence goes further. The State demonstrated that K.C. suffered numerous injuries while in Rolston's care the like of which he did not suffer while in the care of other adults. The only adult who ever seemed to witness those other injuries was Rolston. Indeed, the State demonstrated that K.C. had suffered a prior brain contusion and brain bleed and that, in a timeframe consistent with those injuries—namely, two days prior to his death—K.C. began to display symptoms consistent with those injuries. In particular, K.C. walked with a limp, he vomited for no apparent reason, he abnormally soiled

himself, and he was abnormally tired. However, the morning of his death, K.C. was again acting normally when Anissa left him in Rolston's care.

[29] Further still, the State's evidence negated Rolston's claim at the time of K.C.'s death that K.C. had choked to death. Richard, the initial first responder on the scene and Rolston's husband, confirmed that, upon his arrival, K.C. had no blockage of his airway. Dr. Hischler testified that, in his experience, a child who is choking will begin breathing again upon the removal of the blockage from his airway. Yet, despite a clear airway, responders were unable to resuscitate K.C. And Dr. Prahlow confirmed that his autopsy of K.C. did not reveal blockage or damage to K.C.'s airway. The jury was free to conclude from the State's evidence that Rolston fabricated her claim that K.C. had choked.

[30] Rolston's reading of the record on appeal attempts to piecemeal the evidence and testimony in a way that constructs a narrative most favorable to her rather than one that is most favorable to the verdict, which is contrary to our standard of review. We reject Rolston's suggestions to reweigh the evidence or reassess the witnesses. The State met its burden to prove, beyond a reasonable doubt, that Rolston committed a battery on K.C. that resulted in K.C.'s death. We affirm her conviction.

## Issue Three:  Sentencing

[31]   Finally, Rolston contends that her thirty-year sentence, with two years suspended to probation, is inappropriate in light of the nature of the offense and her character.[1]  As we have explained:

> Indiana Appellate Rule 7(B) permits an Indiana appellate court to "revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  We assess the trial court's recognition or nonrecognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate.  *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006).  The principal role of appellate review is to "leaven the outliers."  *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008).  A defendant must persuade the appellate court that his or her sentence has met the inappropriateness standard of review. *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007).

*Robinson v. State*, 61 N.E.3d 1226, 1228 (Ind. Ct. App. 2016).

[32]   Here, the trial court identified the following aggravating factors when it imposed its sentence:  (1) K.C.'s young age; (2) Rolston's position of trust over him at the time of his death; (3) Rolston's criminal history, which consisted of a Class A misdemeanor for neglect of a dependent; and (4) the nature and circumstances of the offense, which the court recognized as extremely

---

[1]  The State responds to Rolston's argument by stating that the trial court did not abuse its discretion when it sentenced her.  We do not read Rolston's argument to be a challenge to the court's exercise of its discretion in sentencing but, rather, as a challenge to the appropriateness of her sentence under Indiana Appellate Rule 7(B).

egregious. The court did not identify any significant mitigating circumstances. An executed sentence of thirty years is the maximum sentence for a Level 2 felony. I.C. § 35-50-2-4.5.

[33] Rolston asserts that her sentence is inappropriate in light of the nature of the offense because the trial court "erroneously concluded that the injuries inflicted were . . . 'less than two hours old,' and Rolston was the only adult who could have inflicted injury on the child . . . ." Appellant's Br. at 30. Rolston also generally asserts that the trial court's assessment of the nature and circumstances of the offense "was merely an endorsement of the jury's verdict . . . ." *Id.* at 30-31. We cannot agree. As explained in Issue Two, the evidence most favorable to the verdict demonstrates K.C.'s time of death and places Rolston as the only adult with K.C. at the time. And it is well established that the trial court may consider the nature and circumstances of the offense as an aggravator. *E.g.*, *Gomilla v. State*, 13 N.E.3d 846, 853 (Ind. 2014). Moreover, we agree with the trial court's assessment that the nature and circumstances of Rolston's offense were extremely egregious.

[34] With respect to her character, Rolston asserts that her sentence is inappropriate because, given her age of sixty years old, "[s]erving seventy-five percent of her [executed] sentence . . . means she will most likely die in prison." Appellant's Br. at 30. Rolston also argues that numerous letters and other evidence Rolston had presented on her own behalf demonstrates her good character. But Rolston disregards the fact that she has a prior conviction for neglect of a dependent and that her battery of K.C. occurred while she was in a position of trust over him.

And, in any event, we are not persuaded that the character evidence Rolston relies on was significant, especially in light of the extremely egregious nature of the offense. Accordingly, we cannot say that Rolston's sentence is inappropriate in light of the nature of the offense and her character.

### Conclusion

[35] In sum, we affirm Rolston's conviction and sentence.

[36] Affirmed.

Riley, J., and Bradford, J., concur.