

FILED

Oct 26 2017, 8:42 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Susan D. Rayl
Smith Rayl Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Mark Leonard, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | October 26, 2017 <br><br> Court of Appeals Case No. 49A02-1703-CR-443 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Sheila A. Carlisle, Judge <br><br> Trial Court Cause No. 49G03-1303-FA-20360 |

**May, Judge.**

[1]   Mark Leonard appeals his conviction of Class A felony conspiracy to commit murder.[1]  He presents two arguments for our review:

> 1.  Whether the trial court abused its discretion when it admitted Exhibits 3 and 4 because the admission violated Leonard's right to counsel under Article 1, Section 13 of the Indiana Constitution; and

> 2.  Whether it was fundamental error when the trial court admitted Exhibit 7, a letter containing a map to Mark Duckworth's house.

We affirm.

# Facts and Procedural History

[2]   On November 10, 2012, a house in the Richmond Hill subdivision exploded. Leonard, who lived in the house, but was not home at the time, became a person of interest.  During their investigation of Leonard, police spoke with Mark Duckworth, Leonard's longtime friend.  Duckworth gave police information relevant to their investigation.

[3]   On December 21, 2012, police arrested Leonard in connection with the Richmond Hill explosion.  The State charged Leonard with multiple crimes, including murder, conspiracy to commit insurance fraud, and arson

---

[1] Ind. Code § 35-42-1-1 (2007) (murder); Ind. Code § 35-41-5-2(a) (1977) (conspiracy).

("Explosion Case"). The probable cause affidavit supporting these charges referenced Duckworth as "MD." (Ex. Vol. I at 221.)

[4] While awaiting trial, Leonard was housed in Cellblock 4D of the Marion County Jail. Also in Cellblock 4D was Robert Smith, who went by the nickname "Smitty." (Tr. Vol. II at 13.) In the past, Smith had worked as an informant with the Marion County Sheriff's Department ("MCSD"). On March 4, 2013, Smith sent an envelope to his police contact, MCSD Deputy Corey McGriff. Deputy McGriff was out of town, so Sergeant Cory Grogg took possession of the envelope.

[5] The envelope contained a letter and a map, and the envelope was marked, "Don't open without gloves on!" (Ex. Vol. I at 158.) The letter stated:

> Hey,
>
> A friend of mine is in jail Because, of Mark Duckworth. He's running his jaws on Lynard, Gill, and all of Mark's friends.
>
> Mark wants an accident to happen to Duckworth.
>
> He doesn't want Duckworth to show up for court or show up at all. ☺
>
> He's telling on them now. He might tell on you next who knows.
>
> Lynard will pay $15,000 for this accident.

Mark is also drawing a map to show you were Duckworth lives. Its in closed.

After this accident happens let us know. Mark said he would pay the $15,000 like this

Agree payment 180 days upon release.

(*Id*. at 159) (errors in original). The phrase "Agree payment 180 days upon release," (*id*.), was in different handwriting than the rest of the letter, and there was a signature after that language. Also included was a map.

[6] At trial, the envelope, letter, and map were admitted over Leonard's objection as Exhibit 7 ("Letter Exhibit"). Duckworth identified the handwriting inconsistent with the rest of the letter and the signature to be Leonard's handwriting and signature. He also testified the map enclosed with the letter was drawn in Leonard's handwriting, depicted the area in which Duckworth lived, and included information about a white Ford Explorer that Duckworth owned.

[7] Sergeant Grogg contacted Detective Jeffrey Wager and Marion County Deputy Prosecutor Denise Robinson, who were both involved in the Richmond Hill explosion case. Detective Wager contacted Duckworth and then the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). On March 7, 2013, ATF Special Agent Jeremy Godsave met with Robinson and Detective Wager, and the group formulated a plan "to try to corroborate the -- the [sic] threat of -- of [sic] the murder of Mark Duckworth." (Tr. Vol. III at 46.) The group decided

Special Agent Godsave would pose undercover as a hitman named "Jay." (*Id.* at 47.) Special Agent Godsave provided Detective Wager a phone number to give to Smith, who would then deliver it to Leonard. The phone number was to be given to Leonard to "gauge his seriousness and see if he would actually call [Special Agent Godsave] as someone that he thought would be a hit man." (*Id.* at 48.)

[8] On March 13, 2013, Leonard called "Jay" using Smith's jail phone PIN number. The call was recorded per standard jail procedure. He identified himself as "Mark," a friend of "Smitty's." (Ex. Vol. I at 116.) Leonard indicated to "Jay" he drew the map "Smitty's old lady" gave to "Jay." (*Id.*) Leonard and "Jay" then discussed parts of the map and the area depicted on the map. Leonard told "Jay" he had known the person referenced on the map, "for 25 years, he's just blabbing like a mother fucker." (*Id.* at 125.) Leonard told "Jay" he wanted "this thing" done "[y]esterday." (*Id.* at 126.) The discussion of the act continued:

> [Leonard]: See. I know it's hard -- I know it's hard to understand but like, um, if -- if -- if I was in your shoes and you know somebody was telling me and I looked at this situation, I'd have to scope it out too but -- like let me tell you on the -- on the scale of one to ten, how easy it will be? It'll be a, um--
>
> ["Jay"]: Yup.
>
> [Leonard]: --It'll be a ten, it's that easy cause there nobody around there, you know?

["Jay"]:  Yeah.  You want a -- you want me to -- you want me to send a message or anything like that?

[Leonard]:  Nope.

["Jay"]:  Okay.

[Leonard]:  Hell no.  Just make --

["Jay"]:  You just want it quick and quiet and shit?

[Leonard]:  Yep.  Yeah, just, uh --

["Jay"]:  You don't want the mother fucker to suffer?

[Leonard]:  No, fuck it.  That takes too much time.

["Jay"]:  Dude, I enjoy that shit, though.

[Leonard]:  Get it over with.  Well, if you wanna.  (Laughing).

["Jay"]:  Alright.

[Leonard]:  (Laughing).

["Jay"]:  I'll bring your ass a souvenir if you want.

[Leonard]:  Yeah, I want me -- reading in the paper will be enough.

(*Id*. at 127-8) (errors in original). "Jay" told Leonard to call him the next day to confirm the plans.

[9] On March 14, 2013, Leonard called "Jay" again, using Smith's jail phone PIN number. The call was recorded per standard jail procedure. "Jay" indicated he went to "where dude [sic] lives" and "there's a sign that says like no 'something' on the fence, right there by his car." (*Id*. at 136.) Leonard told "Jay" the sign said, "Verboten, it means no trespassing in German, or something." (*Id*.) Leonard and "Jay" went on to discuss the murder:

> [Leonard]: But here's the thing. I wanna make it look like, um -- um -- you asked me last night about how I want to do it.
>
> ["Jay"]: Yeah.
>
> [Leonard]: Wanna make it -- I want to make it look like a suicide.
>
> ["Jay"]: Ah, for real.
>
> [Leonard]: Yeah, because if -- see this way, it will get me out of jail pretty much instantly -- if you have him call 911 from his, like cell phone . . .
>
> ["Jay"]: Yeah.
>
> [Leonard]: Right before you do it -- and write -- I got three sentences that I wrote down -- and if you just have him say these three sentences inside that 911 call right before, it'll get me out of here quick.

["Jay"]: No shit? What do you want him to say?

[Leonard]: I want him to say, "I did not mean to frame Mark and Moncie for their own house in Richmond Hills" -- then the other sentences, "there are large amounts of money he always leaves laying around, and that's what bought -- bought a lot of drugs and whores -- um -- um, three sentences, but if he says that dude, they'll let me out of here fucking within a couple days I bet.

["Jay"]: Alright, comment again on that so I get it down right, you know what I mean?

[Leonard]: Yeah, okay, yeah I hear you bro. Alright, "I did not mean to frame Mark and Moncie for their own house in Richmond Hills."

["Jay"]: Moncie?

[Leonard]: Moncie, M-O-N-C-I-E, that's my ole lady's name.

["Jay"]: Okay, "I did not mean to frame Mark and Moncie for . . ."

[Leonard]: "There own house in Richmond Hills."

(*Id*. at 138-9) (errors in original). Leonard told "Jay" he would "need a throw away -- and um, just make sure the gun is either missing all the other bullets or just missing one, because he's going to have one shot to the head." (*Id*. at 141.) Leonard also suggested "Jay" threaten the victim's parents so the victim would say the sentences on the 911 call. Finally, Leonard and "Jay" discussed

payment, and Leonard told "Jay" he would "give [him] an extra 5 . . . cause this is going to make a big difference right here[.]" (*Id*. at 144.) At trial, Duckworth confirmed many of the details that were discussed in the phone calls, including the placement of the "Verboten" sign.

[10] On March 25, 2013, Smith was moved to Cellblock 4F while Leonard remained in Cellblock 4D. On March 27, Leonard wrote a letter to Smith:

> Hey there bro.
>
> Still no word of anything. I can't really talk about it yet. Can you send me something. I owe you a bike when this is over. If already done I need something. Please don't let me down.
>
> Mark

(*Id*. at 162) (errors in original). Leonard's DNA was found on the letter and Duckworth testified the letter was in Leonard's handwriting.

[11] Smith was released from jail on March 28, 2013. He pled guilty to the charges in his pending criminal cases, and the ATF paid him $5,000.00 for his cooperation in the investigation against Leonard. On March 29, Leonard's letter to Smith was returned to the jail marked, "RETURN TO SENDER NO SUCH NUMBER UNABLE TO FORWARD[.]" (*Id*. at 163.) Sergeant Grogg took possession of the letter shortly after it was returned.

[12] The State charged Leonard with Class A felony conspiracy to commit murder. Leonard filed a motion to suppress on State Constitutional grounds the jail calls

from March 13 and 14 ("Jail Phone Calls"), and the trial court denied his request following a suppression hearing. On January 30 and 31, 2017, the trial court held a jury trial. At trial, Leonard objected to the admission of the Jail Phone Calls, on grounds different than those set forth in his motion to suppress. After the Jail Phone Calls were admitted, Leonard belatedly renewed his objection to the admission of the Jail Phone Calls based on State Constitutional grounds. He also objected to the admission of the Letter Exhibit, which included the envelope, letter, and map that Smith gave to Sergeant Grogg.

[13] The jury found Leonard guilty as charged. On February 8, 2017, the trial court sentenced Leonard to fifty years incarcerated.

# Discussion and Decision

## I. General Standard of Review

[14] We review rulings regarding the admission of evidence for an abuse of discretion, which occurs "when a decision is clearly against the logic and effect of the facts and circumstances before the court." *Johnson v. State*, 992 N.E.2d 955, 957 (Ind. Ct. App. 2013), *trans. denied*. We do not reweigh the evidence or assess the credibility of witnesses. *Id*. Instead, we "consider conflicting evidence in a light most favorable to the trial court's ruling." *Id*.

## II. Jail Phone Calls

[15] Leonard concedes he did not timely object at trial to the admission of the Jail Phone Calls with "Jay" on State Constitutional grounds, which is the crux of

his argument on appeal. Thus, he must demonstrate fundamental error. *See Taylor v. State*, 687 N.E.2d 606, 609 (Ind. Ct. App. 1997) (defendant who does not object at trial waives any claim of error on appeal unless the error is fundamental), *trans. denied*. Fundamental error is a "blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Kimbrough v. State*, 911 N.E.2d 621, 634 (Ind. Ct. App. 2009). The fundamental error exception is extremely narrow. *Id.*

[16] Leonard argues the admission of the Jail Phone Calls violated his right to counsel under Article 1, Section 13 of the Indiana Constitution.[2] Our Indiana Supreme Court examined facts very similar to this case in *Jewell v. State*, 957 N.E.2d 625 (Ind. 2011). In that case, Jewell was arrested and charged with Class A misdemeanor tattooing a minor for taking his stepdaughter, T.S., to get a tattoo. The alleged tattooing incident occurred in August 2008. While those charges were pending T.S. divulged she had a sexual relationship with Jewell from 2004 to 2007, starting when she was thirteen years old.

[17] A detective arranged for T.S. to call Jewell in an effort to obtain evidence for the sexual misconduct allegations. The detective recorded the phone calls, was present during the calls, and "prompted T.S. with notes on things to say and

---

[2] Our Indiana Supreme Court addressed the admissibility of the Jail Phone Calls under a Sixth Amendment analysis in *Leonard v. State*, 73 N.E.3d 155, 165-8 (Ind. 2017). In that case, the Court held Leonard's Sixth Amendment right to counsel had yet to attach to the conspiracy charge because it was a separate offense for which he had not been charged. *Id*. at 168.

questions to ask." (*Id*. at 628.)  During the conversation, Jewell mentioned the pending misdemeanor charge and that he had retained an attorney, but he also made several incriminating statements about the alleged sexual misconduct. Based thereon, the State charged Jewell with multiple sex-related crimes.

[18] Jewell moved to suppress the statements made in the phone calls with T.S. on the grounds they violated his right to counsel under the Sixth Amendment and Article 1, Section 13 of the Indiana Constitution.  The trial court denied his motion to suppress and overruled his renewed objection to the admission of the evidence at trial.  The trial court found Jewell guilty, and he appealed, alleging the trial court abused its discretion when it admitted the statements in the phone calls with T.S. because they violated his right to counsel under the Sixth Amendment and Article 1, Section 13 of the Indiana Constitution.

[19] Our Indiana Supreme Court held, based on *Texas v. Cobb*, 532 U.S. 162 (2001), that the Sixth Amendment right to counsel had not yet attached at the time of the phone calls with T.S. because the protection is specific to the offense.  *See Jewell*, 957 N.E.2d at 629 (Protections under the Sixth Amendment "are 'offense specific,' [and] do not attach until formal commencement of adversarial proceedings, and 'cannot be invoked once for all future prosecutions.'") (quoting, in part, *Cobb*, 832 U.S. at 175).  However, the Court also noted two exceptions to the "offense specific" nature of the Sixth Amendment - the "inextricably intertwined" exception and the "circumvention of Sixth Amendment right" exception.  *Id*. (citing *Brewer v. Williams*, 430 U.S. 387 (1977), *reh'g denied*, and *Maine v. Moulton*, 474 U.S. 159 (1985)).

[20] After concluding Jewell's statements did not fall within either of those exceptions for the purposes of his Sixth Amendment right to counsel, the Court moved on to an analysis of Jewell's right to counsel under Article 1, Section 13 of the Indiana Constitution. In doing so, the Court noted, as a preliminary matter, Indiana courts have long held

> the Indiana Constitution provides a more protective right to counsel than the Sixth Amendment, specifically in that Indiana's constitutional right - contrary to the Sixth Amendment - can attach "prior to the filing of formal charges against the defendant," but both provisions "guarantee the right to counsel at any critical stage of prosecution where counsel's absence 'might derogate from the accused's right to a fair trial.'"

*Id*. at 634 (citations omitted). However, it recognized the holding in *Hall v. State*, which treated Article 1, Section 13 of the Indiana Constitution as "offense specific" like the federal right. 870 N.E.2d 449, 460 (Ind. Ct. App. 2007), *trans. denied*. The Court then examined the question, "does the 'inextricably intertwined' exception have a place within Indiana's constitutional protections?" *Jewell*, 957 N.E.2d at 634.

[21] Holding the "inextricably intertwined" exception does apply to Article 1, Section 13 of the Indiana Constitution, our Indiana Supreme Court set forth factors to determine whether that exception applies to the "offense specific" nature of an Article 1, Section 13 right to counsel challenge.

> The "inextricably intertwined" exception to the general rule that Section 13's right to counsel protection is offense specific applies when it was objectively foreseeable that the pending offense, for

which the right to counsel has already attached, was so inextricably intertwined with the offense under investigation that the right to counsel for the pending offense could not be constitutionally isolated from the right to counsel for the offense under investigation. The inquiry focuses on the nature of the conduct involved rather than on the elements of the offenses. A reviewing court must examine and compare all the facts and circumstances - as known at the time of the investigation - related to the conduct, including the nature of the conduct, the identity of the persons involved (including the victim, if any), and the timing, motive, and location of the crimes.

None of those factors is particularly dispositive, nor do all factors need to tip in favor of the exception for it to apply. However, the greater the commonality of the factors and the more directly linked the conduct involved, the more likely it is that the two offenses are "inextricably intertwined."

*Id*. at 635-6. We now turn to these factors as applied to the case before us.

[22] In the Explosion Case, it is undisputed the right of counsel had attached. Leonard was accused of arson, insurance fraud, and murder in a plot to blow up his girlfriend's house in order to collect insurance money. Leonard carefully planned the manner in which the explosion would occur, as well as seemingly plausible alibis for himself and his girlfriend. The crime involved multiple actors, including Leonard and his girlfriend. The victims of that crime were many - two people who were killed as a result of the explosion and many others in the neighborhood who sustained property damage.

[23] In the case at issue here, Leonard conspired with "Jay" to kill Duckworth before he could be a witness against Leonard. Leonard also believed

Duckworth's death would result in his release from jail. Leonard called "Jay" twice using Smith's jail phone PIN number, discussed the map he drew to Duckworth's house and details about Duckworth's house, suggested ways to kill Duckworth, and told "Jay" what Duckworth should say to authorities prior to his staged suicide.

[24] Leonard's arguments complicate a very simple analysis. He attempts to attach a right to counsel based on the fact the detective investigating the murder for hire plot knew Leonard was in jail and had counsel for the explosion-related charges. He then asserts the State's mention of the explosion case during the murder-for-hire case indicated the interweaving of the offenses. They are related, however, only to the extent that but for his commission of one crime, Leonard would not have attempted to commit another.

[25] Considering "all the facts and circumstances - as known at the time of the investigation - related to the conduct, including the nature of the conduct, the identity of the persons involved (including the victim, if any), and the timing, motive, and location of the crimes[,]" as set forth in *Jewell*, 957 N.E.2d at 635, the two cases are not inextricably intertwined. Thus, Leonard's Article 1, Section 13 right to counsel did not attach in the murder-for-hire case. To hold otherwise would frustrate the police's "interest in investigating new or additional crimes after an individual is formally charged with one crime." *Hall*, 870 N.E.2d at 461. Further, "[t]he right to counsel is a shield against what may well be the coercive influences of the State. The rule's salutary function cannot be distorted to immunize one represented by an attorney against investigative

techniques that capture a new crime in progress." *People v. Ferrara*, 430 N.E.2d 1275, 1279 (N.Y. 1981).

### Letter Exhibit

[26] Leonard argues the trial court abused its discretion when it admitted the Letter Exhibit, which included an envelope, the letter indicating Leonard would like Duckworth killed, and a map to Duckworth's house, because "(1) it was not property [sic] authenticated, (2) hearsay not falling within an exception, and (3) violated his constitutional right to confront and cross-examine a witness against him." (Br. of Appellant at 12.)

[27] We need not decide whether the challenged statements were hearsay or were improperly admitted, as any such error was harmless. Errors in the admission of evidence "are to be disregarded as harmless unless they affect the substantial rights of the party." *Mathis v. State*, 859 N.E.2d 1275, 1280 (Ind. Ct. App. 2007). An error in the admission of evidence may be harmless when the evidence is merely cumulative of other properly admitted evidence. *Id.*

[28] Here, the Letter Exhibit contained information discussed in the Jail Phone Calls, such as the location of Duckworth's house and the amount of money Leonard offered "Jay" to kill Duckworth. As we have determined the Jail Phone Calls were properly admitted, any error in the admission of the Letter Exhibit is harmless because the information included therein was cumulative of other properly admitted evidence, including the Jail Phone Calls.

# Conclusion

[29] The trial court did not commit fundamental error when it admitted the Jail Phone Calls because they were not obtained in violation of Leonard's right to counsel under Article 1, Section 13 of the Indiana Constitution. In addition, any error in the admission of the Letter Exhibit was harmless because the information contained therein was merely cumulative of other properly admitted evidence. Accordingly, we affirm.

[30] Affirmed.

Barnes, J., and Brown, J., concur.