

**FILED**

Apr 25 2019, 5:23 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

P. Jeffrey Schlesinger
Office of the Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

I N  T H E

# COURT OF APPEALS OF INDIANA

Nicholas Pelissier,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 25, 2019

Court of Appeals Case No.
18A-CR-710

Appeal from the Lake Superior
Court

The Honorable Salvador Vasquez,
Judge

Trial Court Cause No.
45G01-1702-MR-3

**May, Judge.**

[1] Nicholas Pelissier appeals his convictions of and sentences for murder[1] and Level 1 felony attempted murder.[2] He raises three issues, which we restate as:

> 1. Whether the trial court abused its discretion when it admitted into evidence videotaped recordings of witness Kendall Vaughn's prior statements to police;
>
> 2. Whether the trial court abused its discretion when it admitted into evidence the photo array from which Detective Jeffrey Minchuck testified Vaughn identified Pelissier as one of the shooters; and
>
> 3. Whether Pelissier's aggregate sentence of eighty-five years is inappropriate based on the nature of the offense and Pelissier's character.

We affirm.

## Facts and Procedural History[3]

[2] On November 12, 2016, Timothy Fryerson and his friend, Jondell Golinda, walked to a gas station near Golinda's house and purchased cigarettes and snacks. As they left the gas station and were walking across the parking lot, a red Dodge Durango SUV was at one of the gas pumps. Someone in the SUV

---

[1] Ind. Code § 35-42-1-1 (2014).

[2] Ind. Code § 35-42-1-1 (2014) (murder); Ind. Code § 35-41-5-1 (2014) (attempt).

[3] We held oral argument in this case on March 7, 2019, at Valparaiso High School. We thank administration for their hospitality and counsel for their able presentations.

said something to Fryerson and Golinda, to which they did not respond. The rear door of the SUV opened, and William Galloway exited the SUV and displayed a gun. Golinda and Fryerson continued walking.

[3] Fryerson called his father and told him to "be looking out for [him,] at least they'll know if anything happen[ed] to [him]." (Tr. Vol. II at 157.) As Fryerson and Golinda turned the corner to walk down another street, they noticed the SUV was following them. The SUV stopped, and the two back doors opened. Fryerson and Golinda ran away from the SUV, towards Fryerson's house. As he was running, Fryerson was shot once in the back, "had a stroke and . . . blacked out." (*Id.* at 163.)

[4] Fryerson's mother, who was at the family home, heard gunshots and ran outside. She ran down the street and found Fryerson in the gutter. Fryerson's brother called the police. An ambulance transported Fryerson to a hospital in Chicago, where he remained for about a month. Fryerson was placed in a medically-induced coma for a period of time and experienced partial paralysis as a result of his injuries. The doctor who treated Fryerson testified that without medical intervention "it's very likely he would have died." (Tr. Vol. III at 178.)

[5] Officers found Golinda further down the street from where Fryerson fell. Golinda had been shot ten times and died as a result of his wounds. Police found eight 10-millimeter cartridge cases at the scene of the shooting, all of which had been fired from the same gun. The police also found three 45-caliber

cartridge cases that also had been fired from a single gun. Police also located a mutilated spent bullet from a 40-caliber firearm that did not match the firearm associated with the other shell casings found at the scene.

[6] Gary Police Officer Marcus Harris viewed the surveillance footage from the gas station and watched the interaction between the SUV and the victims. After viewing the video, Officer Harris drove around the neighborhood looking for the SUV. He located the SUV in front of a residence about five to six blocks away from the gas station. Another officer arrived on the scene with his K-9 partner, and the dog led the officers to the front door of a nearby house. After speaking with the owner of the SUV and obtaining consent, police towed the SUV to the crime lab for investigation. In the SUV, officers found Pelissier's fingerprint on one of the rear passenger doors.

[7] During the investigation, police interviewed Tammarshea Jones after connecting her to the SUV. Jones told police she was in the SUV at the time of the shooting. She said the other occupants of the SUV were her boyfriend, Kendall Vaughn, William Galloway, and a "light-skinned dude." (State's Ex. 8.) Jones told police Galloway and the "light-skinned dude" were the shooters. (Id.) Jones knew the "light-skinned guy" as "Freaky" and she reported Freaky returned to the SUV after the shooting and said, "I got his ass." (Id.) At trial, Jones identified Pelissier as the "light-skinned dude" she referred to during her interview with police. (Tr. Vol. V at 96.)

[8] Police interviewed Jones' boyfriend, Vaughn, on November 13, 2016, and January 27, 2017. During those interviews, Vaughn identified Pelissier and Galloway as the shooters. During the second interview, Vaughn looked at a photo array and identified a person he knew as "Freaky" as one of the shooters. He wrote on the photo array, next to Pelissier's picture, "kill[ed] the boy." (State's Ex. 107.) During trial, Vaughn identified Pelissier as the person he knew as "Freaky." (*Id*. at 198.)

[9] On February 1, 2017, the State charged Pelissier with murder and Level 1 felony attempted murder. The trial court held a jury trial from January 8 to January 16, 2018. At trial, Vaughn claimed he did not remember what he was doing on the day of the shooting, he did not remember what he said when he gave statements to the police in November 2016 and January 2017, and he did not remember anything related to the shooting. Over Pelissier's objection, the trial court admitted the video recordings of his statements to police in November 2016 and January 2017. At trial, when asked if Pelissier was in the SUV on the date of the shooting, Vaughn answered, "Not sure. No." (Tr. Vol. V at 203.) During Vaughn's testimony, Pelissier moved for a mistrial, moved to exclude evidence, and asked to be able to depose Vaughn. The trial court denied all three requests.

[10] The trial court also admitted, over Pelissier's objection, the photo array with Pelissier in it, and Detective Jeffrey Minchuk was permitted to testify that Vaughn wrote on the photo array next to Pelissier's picture, "kill[ed] the boy."

(Tr. Vol. VI at 20.) Detective Minchuk also identified Pelissier as an "individual near the vehicle" on the gas station surveillance tape. (*Id.* at 24.)

[11] The jury returned guilty verdicts for Pelissier on both counts. On February 15, 2018, the trial court sentenced Pelissier to fifty-five years for murder, to be served consecutive to a sentence of thirty years for Level 1 felony attempted murder, for an aggregate sentence of eighty-five years incarcerated.

# Discussion and Decision

## Admission of Evidence

[12] We review evidentiary rulings for an abuse of discretion. *Pavlovich v. State*, 6 N.E.3d 969, 975 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurs if the trial court misinterpreted the law or if its decision was clearly against the logic and effect of the facts and circumstances before it. *Id.*

### *Recordings of Vaughn*

[13] At trial, Vaughn testified he could not remember the events of the night of the shooting or any details of the subsequent statements he made to police in November 2016 and January 2017. Thus, the State sought to admit those statements via Indiana Evidence Rule 803(5), which provides for various exceptions to the rule against hearsay. The Rule states, in relevant part:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

(5) Recorded Recollection.  A record that:

> (A)  is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

> (B)  was made or adopted by the witness when the matter was fresh in the witness's memory; and

> (C)  accurately reflects the witness's knowledge.

> If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

Indiana Evidence Rule 803(5).  The parties appear to agree that the first two requirements for admission under Indiana Evidence Rule 803(5) were satisfied, but they disagree about the third requirement, that the recorded recollection accurately reflects the witness's knowledge.

[14]  "[B]efore a statement can be admitted under the recorded recollection hearsay exception, certain foundational requirements must be met, including some acknowledgment that the statement was accurate when it was made."  *Williams v. State*, 698 N.E.2d 848, 850 n.4 (Ind. Ct. App. 1998), *reh'g denied*, *trans. denied*. "A trial court should not admit a witness's statement into evidence when the witness cannot vouch for the accuracy of the statement nor remember having made the statement."  *Ballard v. State*, 877 N.E.2d 860, 862 (Ind. Ct. App. 2007).

[15] Pelissier argues our holding in *Ballard* controls. In that case, the trial court convicted Ballard of Class C felony battery based in part on the testimony of the victim, Alisa Hatchett. During Ballard's bench trial, the State called Hatchett to testify. Hatchett "claimed to have no memory of the night in question." *Id*. at 861. Over Ballard's objection, the trial court permitted the State to read, pursuant to Indiana Evidence Rule 803(5), the recorded recollection hearsay exception, excerpts of an earlier interview Hatchett had given shortly after the incident to Detective Douglas Wright. *Id*.

[16] On appeal, Ballard argued, like Pelissier does here, that "the State failed to lay a proper foundation for the introduction of the prior recorded statement pursuant to Evid. R. 803(5)." *Id*. at 863. Our court determined the State did not lay a sufficient foundation for the admission of the evidence, because Hatchett repeatedly testified she did not remember the incident and she did not remember what she said to Detective Wright. *Id*. As she did not "vouch for the accuracy of the statement to Detective Wright - a statement that she did not remember making . . . the excerpts from the transcribed statement should not have been admitted under Evid. R. 803(5)." *Id*.

[17] The facts in *Ballard* are distinguishable. First, the inadmissible statement in Ballard was written and here the statement was recorded on video. Additionally, in *Ballard*, Hatchett "denied knowing whether she had spoken to a detective" about the night in question, and asserted "that she probably said a lot of things . . . that were not true." *Ballard*, 877 N.E.2d at 863. Here, Vaughn never indicated what he said was not true, and "repeatedly stated that he had

already answered the questions and referred the questioner to the video[.]" (Br. of Appellee at 12.) Finally, Hatchett testified "that her daily habit of drinking gin caused her memory to lapse" and she might have given "an inaccurate account of the evening in question." *Id.* However, as part of his statement on November 2016, Vaughn indicated he was telling the truth. (State's Ex. 111.)

[18] An error in admitting evidence does not require reversal unless it affects the substantial rights of a party. *Stewart v. State*, 754 N.E.2d 492, 496 (Ind. 2001). "The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Barker v. State*, 695 N.E.2d 925, 931 (Ind. 1998), *reh'g denied*. The erroneous admission of evidence may also be harmless if that evidence is cumulative of other evidence admitted. *Donaldson v. Indianapolis Pub. Transp. Corp.*, 632 N.E.2d 1167, 1172 (Ind. Ct. App. 1994).

[19] In her video-recorded interview with police, the admission of which Pelissier does not challenge, Jones stated one of the shooters was a "light skinned dude." (State's Ex. 108.) At trial, Jones identified Pelissier as the "light skinned dude." (Tr. Vol. V at 96.) Additionally, Pelissier's fingerprint was found on one of the rear doors of the SUV, and one of the victims testified that the shooters both came out the rear doors of the SUV. Based thereon, we conclude that any error in the admission of Vaughn's videotaped statements was harmless because the evidence in question was cumulative of other properly-admitted evidence. *See*

*Tobar v. State*, 740 N.E.2d 106, 108 (Ind. 2000) ("Evidence that is merely cumulative is not grounds for reversal.").

### *Photo Array*

[20] Relatedly, Pelissier argues the trial court abused its discretion when it admitted the photo array with "kill[ed] the boy" written next to Pelissier's picture and Detective Minchuk's testimony that Vaughn wrote that on the photo array. When the photo array was admitted, Pelissier objected, stating:

> [Pelissier]:    On State's Number 107 [the photo array], I would object in that we've had [Vaughn] testify as to he circled a picture and he acknowledged signing it.  I don't recall [Vaughn] testifying that he, in fact, wrote these words on here, number 4 is the man how kill the boy [sic].

> [State]:        Your Honor, Mr. Vaughn testified that he recognized that document as the photographic lineup that he reviewed during that second interview.  Further, Detective Minchuk was present during this interview.  He was the one who prepared it and showed it to Mr. Vaughn.  And, therefore, I believe sufficient foundation has been laid for the admission of State's Exhibit 107.

> [Pelissier]:    I think identifying the person as number 4 is different than adding the subsequent statement that is very prejudicial to the defendant without authentication by Mr. Vaughn of that statement.

> [Court]:        It's true that Vaughn never identified that extra language.  Foundation has been met to allow 107 to be admitted.

[State]:     Your Honor, once more I would note that we watched today an interview where it's -- you can clearly see Kendall Vaughn making those notes on that document.

[Pelissier]:   We don't know what Kendall Vaughn is stating -- writing on the document.  We hear him say write your name and date it.  We don't know what words are being written.  The camera is not on his handwriting at that time.  And to admit this additional language is more prejudicial than probative.  He acknowledges that he circled the -- the picture.  He acknowledged that he said that was Freaky.  He acknowledged that he dated and signed.  But that exact language, we don't have that -- that verification.

[State]:     This fails to mention that the detective also instructed Kendall Vaughn to write on that piece of paper how he knows or recognizes the individual.

[Court]:     That did come out during that tape.  Okay.  Your objection is noted and it's overruled.

(Tr. Vol. VI at 14-6.)

Regarding the markings on the photo array, Detective Minchuk testified:

[State]:     And to the best of your knowledge did [Vaughn] also make the markings on the upper right-hand portion of State's Exhibit 107 [the photo array]?

[Minchuk]:  Yes, sir.

[State]:     Did he make those in your presence?

[Minchuk]:   Yes, sir.

[State]:       And what does that indicate?

[Minchuk]:   "Number 4 is the man --" it appears, "how killed the boy," or now killed the boy.

(*Id.* at 20.) Detective Minchuk then testified that "Number 4" was Pelissier. (*Id.*)

[21] Pelissier contends on appeal, as he did before the trial court, that the State did not provide sufficient foundation to prove that Vaughn wrote "Number 4 is the man how kill[ed] the boy[,]" (State's Ex. 107) (errors in original), because Vaughn never testified that he wrote those words on the photo array. Pelissier reiterates his argument regarding the inadmissibility of Vaughn's videotaped statements. Additionally, Pelissier directs us to inconsistencies in Vaughn's testimony such as Vaughn saying that Pelissier was never in the SUV, (*see* Tr. Vol. V at 203), that Vaughn testified he did not know Freaky, and that when Vaughn identified Pelissier in the photo array he did so because "[s]omebody that I asked somebody else who was Freaky and they said that -- they showed me a picture of that face right there. . . . They showed me a picture of this man right here, so I circled the picture." (*Id.* at 170) (errors in original).

[22] However, as was the case with the admission of Vaughn's videotaped statements, any error in the admission of the writing on the photo array is harmless because it is cumulative of evidence properly admitted including Jones' testimony and fingerprint evidence indicating Pelissier was present in the

rear of the vehicle involved in the shooting. *See Leonard v. State*, 86 N.E.3d 406, 413 (Ind. Ct. App. 2017) (error in the admission of evidence is harmless if cumulative of other properly admitted evidence), *trans. denied*.

## Inappropriate Sentence

[23]     Under Ind. Appellate Rule 7(B), we may revise a sentence if, after due consideration of the trial court's decision, we find the sentence inappropriate in light of the nature of the offense and the character of the offender. *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007), *clarified on reh'g* 875 N.E.2d 218 (Ind. 2007). We consider not only the aggravators and mitigators found by the trial court, but also any other factors appearing in the record. *Johnson v. State*, 986 N.E.2d 852, 856 (Ind. Ct. App. 2013). We defer to the trial court's decision, and our goal is to determine whether the defendant's sentence is inappropriate, not whether some other sentence would be more appropriate. *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012), *reh'g denied*. Pelissier, as the appellant, bears the burden of demonstrating his sentence is inappropriate. *See Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006) (appellant bears burden of demonstrating sentence is inappropriate).

[24]     When considering the nature of the offense, the advisory sentence is the starting point for determining the appropriateness of a sentence. *Anglemyer*, 868 N.E.2d at 494. The advisory sentence for Level 1 felony attempted murder is thirty years, with a sentencing range of twenty to forty years. Ind. Code § 35-50-2-4(b) (2014). The advisory sentence for murder is fifty-five years, with a

sentencing range of forty-five to sixty-five years. Ind. Code § 35-50-2-3(a) (2015). The trial court sentenced Pelissier to the advisory sentence for each crime, thirty and fifty-five years respectively, to be served consecutively for an aggregate sentence of eighty-five years. Pelissier argues his sentence is inappropriate based on the nature of the offense and his character.

[25] Regarding the nature of the offense, Pelissier argues the evidence was not clear regarding what level of culpability was attributable to Pelissier because shell casings from multiple firearms were found at the scene and no one saw who shot the victims. However, the State presented evidence that Pelissier and Galloway opened fire on Fryerson and Golinda, who were unarmed; the attack was unprovoked; and the multitude of shots increased the possibility others besides the intended victims could have been harmed. Based on the nature of the offenses, the trial court "would have been within its discretion to impose terms above the advisory sentence." (Br. of Appellee at 18.) We cannot hold Pelissier's sentence inappropriate based on the nature of the offense. *See Birdsong v. State*, 685 N.E.2d 42, 48 (Ind. 1997) (advisory sentence appropriate for unprovoked murder).

[26] When considering the character of the offender, one relevant fact is the defendant's criminal history. *Johnson*, 986 N.E.2d at 857. The significance of criminal history varies based on the gravity, nature, and number of prior offenses in relation to the current offense. *Id*. Pelissier also asserts he has no criminal record; however, at the sentencing hearing, the parties discussed Pelissier's pre-sentence investigation report, which indicated Pelissier had

"juvenile adjudications" and was "on bond for two cases[.]" (Tr. Vol. VI at 226.)

[27] Pelissier also emphasizes the fact that he was twenty years old when sentenced, and an eighty-five year sentence would mean he would be incarcerated for the majority of his life. However, there are a multitude of cases in which our appellate courts have affirmed similar sentences for offenders younger than Pelissier. *See Monegan v. State*, 756 N.E.2d 499, 504-5 (Ind. 2001) (refusing to consider Monegan's age of seventeen years and eleven months as a mitigator in sixty-year sentence for murder); *also see Spears v. State*, 735 N.E.2d 1161, 1167 (Ind. 2000) (holding an eighteen year old defendant was "beyond the age at which the law commands special treatment by virtue of youth"), *reh'g denied*; *and see Bryant v. State*, 802 N.E.2d 486, 502 (Ind. Ct. App. 2004) (noting "youthful age does not 'automatically' qualify as a significant mitigator" in sentence for eighteen-year-old convicted of murder), *trans. denied*.

[28] Pelissier also requests that we consider that he was raised without a father, was adjudicated a child in need of services, and had to quit school at sixteen years old to work to support his family. We have consistently held that "evidence of a difficult childhood warrants little, if any, mitigating weight. *Coleman v. State*, 741 N.E.2d 697, 703 (Ind. 2000). Finally, Pelissier notes he had been regularly employed and financially supported his three children; however employment is not necessarily mitigating. *See Newsome v. State*, 797 N.E.2d 293, 301 (Ind. Ct. App. 2003) ("Many people are gainfully employment such that this would not require the trial court to note it as a mitigating factor or afford it the same

weight as Newsome proposes"), *trans. denied*. Additionally, two of Pelissier's children were living with their respective mothers and there were no child support orders in place for those children, and thus no mitigating weight should be afforded to Pelissier's claim that he provided financial support to his three children. *See Reese v. State*, 939 N.E.2d 695, 703 (Ind. Ct. App. 2011) (defendant's support of children not considered a mitigating circumstance when the defendant "had no court-ordered child support obligation for his children"), *trans. denied.* Based thereon, we cannot say Pelissier's sentence is inappropriate based on his character. *See Connor v. State*, 58 N.E.3d 215, 221 (Ind. Ct. App. 2016) (sentence not inappropriate despite arguments regarding Connor's young age and difficult childhood).

# Conclusion

[29]     If the trial court erred in the admission of Vaughn's videotaped statement and his notation on the photo array, any error was harmless because those pieces of evidence were cumulative of other properly-admitted evidence. Additionally, Pelissier's sentence was not inappropriate based on the nature of the crime or his character. Accordingly, we affirm.

[30]     Affirmed.


Robb, J., and Tavitas, J., concur.