


FILED

Apr 26 2024, 9:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Matthew Lucious Setlak,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

April 26, 2024

Court of Appeals Case No.
23A-CR-2516

Appeal from the Lake Superior Court

The Honorable Samuel L. Cappas, Judge

Trial Court Cause No.
45G04-1909-F1-47

---

**Opinion by Judge Tavitas**
Judges Mathias and Weissmann concur.

**Tavitas, Judge.**

## Case Summary

[1] Following a jury trial, Matthew Setlak was convicted of three counts of child molesting, Level 1 felonies; one count of child molesting, a Level 4 felony; and one count of dissemination of matter harmful to minors, a Level 6 felony. On appeal, Setlak claims that the trial court abused its discretion by admitting, under the Protected Person Statute, certain out-of-court statements the victim made to her mother. We conclude that the trial court did not abuse its discretion in admitting these statements. We also conclude that any error in the admission of these statements was cumulative of other evidence and, therefore, harmless. Accordingly, we affirm.

## Issue

[2] Setlak presents one issue for our review, which we restate as whether the trial court abused its discretion in admitting, under the Protected Person Statute, statements the victim made to her mother.

## Facts

[3] The victim, L.B., was born in April 2015. Thirty-five-year-old Setlak was a friend of L.B.'s parents and was L.B.'s godfather. L.B. referred to Setlak as "Uncle Matt." Tr. Vol. II p. 7. In 2017, Setlak regularly babysat L.B. and her brother. The children often spent the night with Setlak, who would feed and bathe the children.

[4]     In the fall of 2017, L.B.'s mother ("Mother") was changing two-year-old L.B.'s diaper when she noticed that L.B.'s anal and vaginal areas were red and that there was a discharge coming from the child's vagina. Mother took L.B. to the emergency room, where it was determined that L.B.'s hymen was ruptured. Child Protective Services was also called, but there was no firm evidence of sexual abuse. Mother did not suspect Setlak at the time and instead stopped taking L.B. to a different babysitter. Mother later noticed that, when she returned home while Setlak was babysitting, all the lights in the house were off, and the curtains and blinds were closed. On one particular occasion, Mother found Setlak and L.B. under blankets watching a movie.

[5]     During this time, Setlak's behavior changed. When his friends asked him about his change in behavior, he told them that he had "bad thoughts" and was a "bad person" who had done "a bad thing." Tr. Vol. IV pp. 22, 62. Setlak also indicated that he had suicidal thoughts. Yet Setlak also seemed excited to tell his friends about a culture he had read about that had no age-of-consent laws. In late 2018, Setlak's girlfriend found a pair of young girl's underwear in Setlak's bed. When questioned about this, Setlak explained that "sometimes L.B. would get scared and come in [Setlak's] room and get in the bed with him. And then [Setlak said L.B.] was a bedwetter, so sometimes she would take her panties off." *Id*. at 52. Setlak's girlfriend, however, noticed that the underwear was clean.

[6]     In 2019, Mother noticed that L.B. engaged in sexualized behavior. L.B. would get on her hands and knees and raise her buttocks. Mother also observed L.B.

rubbing her buttocks against other's legs. Mother told L.B. to stop this behavior, but it continued. L.B. also touched her genitals when in the bathtub and even put toys in her vagina. On September 13, 2019, Mother reprimanded L.B. for this continued behavior. In response, L.B. stated, "I've got to tell you why I'm doing the butt stuff. It's because of Uncle Matt[,] but I'm not supposed to tell you." Tr. Vol. III p. 202. Mother then used her phone to take a video of L.B. as the child disclosed that Setlak had been molesting her. L.B. stated that "every day" she was at Setlak's house, Setlak put his penis in her vagina and "butt" and showed her pornographic videos. State's Ex. 1. L.B. also stated that Setlak instructed L.B. to never tell anyone about what he was doing to her. L.B.'s mother reported these disclosures to the police.

[7] Lake County Sheriff's Department Detective Laurie Reilly conducted a forensic interview of L.B. During the interview, Detective Reilly first determined that L.B. could distinguish between the truth and a lie. Detective Reilly also stated that L.B. "gave me numerous examples of the difference between a truth and a lie." Tr. Vol. IV p. 146. Using a body diagram, L.B. marked the areas of her body where Setlak touched her—her nipples, genitals, and buttocks. L.B. indicated that Setlak put his penis on these areas. Using a male body diagram, L.B. indicated where the penis is located and stated that Setlak put his penis in her vagina and buttocks. L.B. also told Detective Reilly that Setlak put his penis in her mouth and that "juice" came out of Setlak's penis. State's Ex. 2.

[8] When she was back at Mother's home, L.B. mentioned Setlak's abuse several times. During one such incident, L.B. reported she accidentally gagged herself

while brushing her teeth. This prompted L.B. to state that she gagged and vomited when Setlak put his penis in her mouth.

[9] On September 19, 2023, Schererville Police Department Detective David Nagle interviewed Setlak. During the interview, Setlak admitted that he had physical contact with L.B., including bathing the child and changing her diaper. Setlak believed L.B. had been molested by someone based on the incident in which Mother took L.B. to the emergency room. Setlak, however, denied that he had molested L.B. Setlak did agree that L.B. knew the difference between the truth and a lie. Setlak also consented to the police searching his phone. The search revealed a large amount of pornography. They also found a cartoon image of an older man holding a small child on the phone; the photo had a caption stating, "Go for it. Even if it means sacrificing everything." State's Ex. 9.

[10] On September 23, 2019, the State charged Setlak with three counts of child molesting, Level 1 felonies, and one count of dissemination of matter harmful to minors, a Level 6 felony. The State subsequently amended the charging information to add a count of child molesting, a Level 4 felony. On March 14, 2023, the State moved to admit, under the Protected Person Statute, L.B.'s out-of-court statements to Detective Reilly and L.B.'s recorded and unrecorded statements to Mother. The trial court held hearings pursuant to the Protected Person Statute on March 17, May 30, June 15, and June 23, 2023. Mother testified at the hearings regarding L.B.'s fear of Setlak and stated that testifying at trial would be "devastating" for L.B. Tr. Vol. II p. 70. The trial court found L.B. to be unavailable as a witness for purposes of the Protected Person Statute.

The trial court also found that L.B.'s out-of-court statements had sufficient indicia of reliability. Setlak's counsel subsequently deposed L.B.

[11] A jury trial was held on July 31 through August 2, 2023. At trial, Setlak objected to Mother's testimony about L.B.'s out-of-court statements to Mother. Setlak also objected to the admission of the video Mother made in which L.B. stated that Setlak molested her. Setlak, however, did not object to the admission of the video of the forensic interview of L.B. conducted by Detective Reilly. *See* Tr. Vol. IV p. 149 (defense counsel stated, "[n]o objection," to the admission of the video recording of the forensic interview). At the end of the trial, the jury found Setlak guilty as charged. On September 21, 2023, the trial court sentenced Setlak to an aggregate term of 120 years of incarceration. Setlak now appeals.

## Discussion and Decision

[12] Setlak argues that the trial court abused its discretion by admitting, under the Protected Person Statute, L.B.'s recorded and unrecorded out-of-court statements to her Mother.

### A. Standard of Review

[13] We review challenges to the admission of evidence for an abuse of the trial court's discretion. *Combs v. State*, 168 N.E.3d 985, 990 (Ind. 2021), *cert. denied*. We will reverse only when the decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013). Our Supreme Court has

cautioned that the Protected Person Statute "impinges upon the ordinary evidentiary regime," which requires trial courts to exercise "a special level of judicial responsibility." *Carpenter v. State*, 786 N.E.2d 696, 703 (Ind. 2003).

[14] "The effect of an error on a party's substantial rights turns on the probable impact of the impermissible evidence upon the jury in light of all the other evidence at trial." *Gonzales v. State*, 929 N.E.2d 699, 702 (Ind. 2010). "The improper admission of evidence is harmless error when the conviction is supported by such substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction." *Pelissier v. State*, 122 N.E.3d 983, 988 (Ind. Ct. App. 2019)*, trans. denied*. "The erroneous admission of evidence may also be harmless if that evidence is cumulative of other evidence admitted." *Id.*

## B. The Protected Person Statute

[15] Indiana Code Section 35-37-4-6, known as the "Protected Person Statute," lists certain conditions under which evidence that would otherwise be inadmissible will be allowed in cases involving certain crimes against "protected persons." *Shoda v. State*, 132 N.E.3d 454, 462 (Ind. Ct. App. 2019), *trans. denied*. "Among the crimes to which the protected person statute applies are sex crimes under Indiana Code chapter 35-42-4, which includes child molesting." *Id.* A "protected person" is defined as including "a child who is less than fourteen (14) years of age at the time of the offense but less than eighteen (18) years of age at the time of trial." I.C. § 35-37-4-6(c)(1).

[16]    Subsection (e) of the Protected Person Statute provides:

> A statement or videotape that:
>
>> (1) is made by a person who at the time of trial is a protected person, as defined in subsection (c);
>>
>> (2) concerns an act that is a material element of an offense listed in subsection (a) or (b) [which includes child molesting] that was allegedly committed against the person; and
>>
>> (3) is not otherwise admissible in evidence;
>
> is admissible in evidence in a criminal action for an offense listed in subsection (a) or (b) if the requirements of subsection (f) are met.

I.C. § 35-37-4-6(e).

[17]    Subsection (f) of the Protected Person Statute then provides that:

> A statement or videotape described in subsection (e) is admissible in evidence in a criminal action listed in subsection (a) or (b) if, after notice to the defendant of a hearing and of the defendant's right to be present, all of the following conditions are met:
>
>> (1) The court finds, in a hearing:
>>
>>> (A) conducted outside the presence of the jury; and
>>>
>>> (B) attended by the protected person in person or by using closed circuit television testimony as described in section 8(f) and 8(g) of this chapter;
>>
>> **that the time, content, and circumstances of the statement or videotape provide sufficient indications of reliability.**
>>
>> (2) The protected person:

> > (A) testifies at the trial; or
>
> > (B) is found by the court to be unavailable as a witness for one (1) of the following reasons:
>
> > > (i) From the testimony of a provider, and other evidence, if any, the court finds that the protected person's testifying in the physical presence of the defendant will cause the protected person to suffer serious emotional distress such that the protected person cannot reasonably communicate. . . .

I.C. § 35-37-4-6(f) (emphasis added).

[18] Factors to be considered in the reliability determination under Subsection (f)(1) "include the time and circumstances of the statement, whether there was a significant opportunity for coaching, the nature of the questioning, whether there was a motive to fabricate, [the] use of age-appropriate terminology, spontaneity, and repetition." *J.A. v. State*, 904 N.E.2d 250, 256 (Ind. Ct. App. 2009); *accord Pierce v. State*, 677 N.E.2d 39, 44 (Ind. 1997).

[19] Setlak argues that L.B.'s recorded and unrecorded statements to Mother provided insufficient indicia of reliability and were, therefore, inadmissible under the Protected Person Statute. We disagree. Mother testified that L.B. understood the difference between the truth and a lie. Detective Reilly also testified that L.B. clearly knew the difference between the truth and a lie. Detective Reilly further testified that L.B. gave several examples of the difference between truth and falsehood, which was more than the detective expected for a child of L.B.'s age. In fact, Setlak himself admitted during his

interview with Detective Nagle that L.B. knew the difference between the truth and a lie.

[20] In addition, L.B. used age-appropriate language when speaking with Mother about Setlak's actions. L.B. did not appear to be coached in any way. Nor is there any suggestion of improper questioning. L.B. also spontaneously disclosed the abuse after Mother reprimanded L.B. for her unusual, sexualized behavior, and nothing in the record would suggest any motive to fabricate the allegations against Setlak. To the contrary, Setlak was a trusted family friend. L.B., using age-appropriate language, consistently stated that Setlak placed his penis in her vagina and "butt."

[21] Setlak claims that L.B.'s recorded and unrecorded statements to Mother were unreliable because it is unclear exactly how much time had elapsed between L.B.'s statement and the acts of molestation she described. Although the exact time the acts occurred is unclear, the State alleged that Setlak molested L.B sometime between October 2, 2016, and July 31, 2019. The State established that L.B.'s statements to Mother were made on September 13, 2019.

[22] Setlak cites our Supreme Court's opinion in *Carpenter*, 786 N.E.2d 696, in support of his argument that too much time elapsed between the molestation and L.B.'s statements for L.B.'s statements to be considered reliable. In *Carpenter*, the three-year-old victim made statements to her mother on May 19, 2000, indicating that she had been sexually molested by her father. The victim then gave a consistent statement during a forensic interview later that day. She

also made a similarly consistent statement to her grandfather several days later. These statements were admitted at trial over the defendant's hearsay objections.

[23] On appeal, our Supreme Court concluded that the admission of these statements was an abuse of discretion. *Id*. at 704. In so holding, the Court emphasized that there was a lack of evidence about when the alleged molestation occurred, writing:

> [T]here is no evidence at all as to when the alleged molestation occurred. That is, while the evidence supports a conclusion that the mother sought both medical attention and the intervention of law enforcement after her conversation with [the victim] on May 19, there is absolutely nothing of record to tie the alleged molestation to May 19 or any other date. Indeed by alleging in its charging information that the offense occurred "on or before April 1, 2000 and May 19, 2000," the State effectively concedes there was a period exceeding six weeks during which the alleged molestation could have taken place.

*Id*. at 703. "Added to these difficulties," the Court also noted that, "during the competency determination at the hearing, [the victim] was asked three times in different ways whether she understood the difference between the truth and a lie. [The victim] responded that she did not." *Id*. at 704. The Court noted that "there is a degree of logical inconsistency in deeming reliable the statements of a person who cannot distinguish truth from falsehood." *Id*.

[24] We find *Carpenter* to be readily distinguishable from this case. Here, unlike the victim in *Carpenter*, L.B. repeatedly stated and demonstrated that she understood the difference between the truth and a lie. Although "[w]e

acknowledge the concern . . . that the 'passage of time tends to diminish spontaneity and increase the likelihood of suggestion,' '[t]here are undoubtedly many other factors in individual cases [to be considered].'" *Taylor v. State*, 841 N.E.2d 631, 636 (Ind. Ct. App. 2006) (quoting *Pierce*, 677 N.E.2d at 44-45).

[25] Here, a consideration of all the factors leads us to the conclusion that the trial court did not abuse its discretion by admitting L.B.'s out-of-court statements to Mother. We find *Taylor*, 841 N.E.2d at 636, instructive. In *Taylor*, we distinguished *Carpenter* and held that the trial court did not abuse its discretion in admitting the child victim's out-of-court statements under the Protected Person Statute. *Id*. We noted that, although at least several weeks had passed between the molestation and the child's statements, the statements were spontaneous, there was no motive for fabrication, the child used age-appropriate language, and the child could distinguish between truth and falsehood. *Id*. The factors that distinguished *Taylor* from *Carpenter* are the same factors that distinguish *Carpenter* from this case.

[26] Even if we were to conclude otherwise, Setlak would not prevail. As noted above, although Setlak objected to the admission of L.B.'s recorded and unrecorded statements to Mother, he did not object to the admission of the forensic interview with Detective Reilly. L.B. told Detective Reilly, among other things, that Setlak put his penis into her vagina and buttocks and made her watch pornographic videos. L.B.'s statements to Mother were thus merely cumulative of her statements to Detective Reilly. It is well settled that the erroneous admission of evidence which is cumulative of other evidence

admitted without objection is not reversible error. *Stewart v. State*, 167 N.E.3d 367, 374 (Ind. Ct. App. 2021) (citing *Hoglund v. State*, 962 N.E.2d 1230, 1240 (Ind. 2012)). Accordingly, even if the trial court abused its discretion by admitting L.B.'s statements to Mother, such does not constitute reversible error.

## Conclusion

[27] The trial court did not abuse its discretion by concluding that L.B.'s out-of-court statements to Mother were sufficiently reliable for admission under the Protected Person Statute. Moreover, even if L.B.'s statements to Mother were inadmissible, any error was harmless. We, therefore, affirm the trial court's judgment.

[28] Affirmed.

Mathias, J., and Weissmann, J., concur.

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Appellate Public Defender
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Catherine E. Brizzi
Deputy Attorney General
Indianapolis, Indiana